UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-20165-FAM-1

UNITED STATES OF AMERICA,

Miami, Florida

Plaintiff(s),

April 30, 2019

vs.

AKRUM ALRAHIB,

Defendant(s).

Pages 1 - 74

---

HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S): CHRISTOPHER B. BROWNE, ESQ.
UNITED STATES ATTORNEY'S OFFICE
99 Northeast Fourth Street
Miami, FL 33132
(305) 961-9419
christopher.browne@usdoj.gov

FOR THE DEFENDANT(S): CARL F. SCHOEPPL, JR., ESQ.
SCHOEPPL LAW, P.A.
4651 N Federal Highway
Boca Raton, FL 33431
(561) 394-8301
carl@schoeppllaw.com

IAN COMINSKY, ESQ.
FOX ROTHSCHILD, LLP
2000 Market Street
Philadelphia PA 19103
(215) 299-2795
icominsky@foxrothschild.com

TRANSCRIBED BY: Joanne Mancari, RPR, CRR, CSR
Court Reporter
jemancari@gmail.com

INDEX OF EXAMINATION

Examination of: Page

JOHN SIDDONS

Cross By Mr. Schoeppl . . . . . . . . . . . . . .19

Redirect By Mr. Browne . . . . . . . . . . . . . .30

Thereupon,

the following proceedings were held:

THE DEPUTY CLERK: Calling United States v. Akrum Alrahib, case No. 19 20165, Criminal, Judge Moreno.

MR. BROWNE: Good morning, your Honor. Christopher Browne for the United States.

THE COURT: Good morning, Mr. Browne.

THE DEFENDANT: Good morning, your Honor.

THE COURT: Good morning, Mr.?

MR. SCHOEPPL: This is Akrum Alrahib and I'm Carl Schoeppl, temporary. I am on behalf of Mr. Alrahib.

Present with me today is cocounsel Ian Cominsky, also entering a temporary appearance on behalf of Mr. Alrahib.

MR. COMINSKY: Good morning, your Honor.

THE COURT: All right. Thank you for that.

I have this down for a detention hearing. Are we going forward?

MR. SCHOEPPL: On behalf of the defense, we are ready to proceed.

THE COURT: Mr. Browne.

MR. BROWNE: Yes, your Honor.

THE COURT: OK.

MR. BROWNE: Your Honor, we are seeking pretrial detention based on risk of flight. As noted in the defendant's filing, which I don't know if the court had an opportunity to

review, but the defendant filed a motion essentially to undo the detention hearing that has already been entered in this case in the Southern District of California.

I have a copy of that order if the court wishes.

THE COURT: That is fine. That would be great.

MR. BROWNE: Yes, your Honor.

THE COURT: Is it on our docket or on the California case?

MR. BROWNE: It was an out-of-district arrest, your Honor, so it appears on the California docket. I do not know if this particular order has been entered; however, I note that defense counsel did file it as an attachment to their pleading which they entered -- excuse me, filed last night.

MR. SCHOEPPL: Your Honor, it is Exhibit A to our motion.

THE COURT: OK. I didn't know that a motion was filed last night.

MR. BROWNE: May I approach, your Honor?

THE COURT: Please.

MR. BROWNE: Can I mark that as Exhibit 1, your Honor?

THE COURT: OK. Accepted.

MR. BROWNE: I can proceed, your Honor, whenever the court's ready.

THE COURT: OK. I'm just trying to catch up on the docket here.

Defendant's expedited motion to review or, sorry, to revoke or amend the order and then a series of notice of filings, which -- is it two different notices? They each have 18 exhibits?

MR. SCHOEPPL: Your Honor, Carl Schoeppl on behalf of the defendant.

The motion that was filed has a retention order and a diamond in a related case and three unpublished orders that we cited as authority. That's for the motion to revoke.

There are separate notices of filing letters in support of Mr. Alrahib that were filed as part of a notice and filing. There are 18 in total, your Honor.

THE COURT: OK. So they are duplicative, these two notices?

MR. SCHOEPPL: They are not. They are completely different, and I can explain to the court what they are if the court so desires.

Oh, I'm sorry. You may be referring -- there might have been an amended notice filed.

THE COURT: That is what it looks like.

MR. SCHOEPPL: If the amended notice is filed, what it is, that just contains redactions, your Honor.

THE COURT: OK. All right.

Mr. Browne.

MR. BROWNE: Thank you, your Honor.

In short, the magistrate judge in the Southern District of California did rule that Mr. Alrahib, the defendant, was a risk of flight. However, there was no hearing held so we do believe that he is entitled to a hearing today. However, I would note that the defendant was arrested in this case crossing the border from Mexico in April of 2019. His Pretrial Services report, on the other hand, he claims that his last travel to Mexico was in 2018.

One of the primary factors for the government's recommendation in this case is the defendant's truly extensive foreign travel. He leaves the jurisdiction in Southern California on a near weekly basis to Mexico. By his own admission he has traveled to the Dominican Republic approximately 100 times. He has business interests both in the Dominican Republic and in Mexico.

I would offer up Government's Exhibit 2, which is a summary of the defendant's extensive foreign travel over the course of the last ten years. I can pass that up to your Honor.

THE COURT: Hold on. We will talk about -- I don't mean to discourage you from organizing your proffer any way that you want to, but didn't this crime occur in 2014?

MR. BROWNE: The indictment alleges a conspiracy that ran from 2014 through 2015. However, the defendant has been involved in multiple tax evasion conspiracies since that date,

all of which he admitted during a voluntary recorded interview with federal agents, and I'm going to get into that a little bit more.

The defendant is also under investigation by the U.S. Attorney's Office in the Eastern District of California where he is the target of a separate tax evasion conspiracy investigation. He is aware of that investigation as he stands here today.

THE COURT: Those are two separate uncharged criminal acts --

MR. BROWNE: That's correct, your Honor.

THE COURT: -- since this indictment.

MR. BROWNE: Yes. The indictment charges a tax evasion conspiracy on imported tobacco products --

THE COURT: Right.

MR. BROWNE: -- which the defendant paid approximately $10 million for. There was subsequent tax evasion conspiracies which continued through 2018 and a separate investigation in the Eastern District of California where the defendant is being investigated for evading state excise tax on tobacco products being shipped into California, where he resides.

THE COURT: OK. Now I understand you said that he paid $9 million, but the indictment charges kickbacks of less than a million, right?

MR. BROWNE: That's correct, your Honor. In short,

the defendant entered into an arrangement with a tobacco importer where he would pay a false price for tobacco products and that false price would be reflected on invoices prepared by the importer. In reality, the defendant was paying directly to the Dominican Republic a sum of approximately $10 million for untaxed tobacco.

The point of entering into the conspiracy with the importer is to hide from Customs and Boarder Protection the actual price that the defendant is paying for the tobacco because that price is the basis for the excise tax which the importer has to pay.

When asked about this particular conspiracy, the defendant summarized his role --

THE COURT: When was the statement given?

MR. BROWNE: This was in May of 2017, your Honor.

The defendant said: "I rode Tony" -- and by "Tony" he's referring to Gitano Pierre Bryant who is named in the indictment.

"I rode Tony's train because his scheme was already moving, and then Tony said, You want to come in and save money riding my train? Then I realized it's a scheme. Then when I saw his scheme, I said, Wait a minute, I need to benefit from your scheme."

That is on page 54 of the interview transcript, which I do have available if the court wants to see it.

More importantly, your Honor, following the charged conduct with Mr. Bryant, which again is approximately a $5 million evasion scheme, the defendant then entered into three different conspiracies with five different partners to evade excise taxes on tobacco products from the Dominican Republic. The defendant admitted to all those conspiracies in his recorded statement. In short, the evidence in this case is overwhelming, your Honor.

THE COURT: Put them in some sort of time context for me. He was interviewed in 2017, knows he is under investigation for at least one, at that time, uncharged scheme?

MR. BROWNE: At that time it was uncharged, your Honor, that's correct.

THE COURT: And has remained at large since 2017 notwithstanding?

MR. BROWNE: He has remained at large because in -- what he did was he came in to attempt to cooperate, your Honor. He met with prosecutors and agents with counsel, claimed that he was interested in resolving his liability based on the scheme charged in the indictment. In actuality what the defendant was doing was continuing to evade excise taxes on Dominican tobacco products through various importers located here in Miami and elsewhere. All of that conduct he admitted.

What he did not admit during the course of his cooperation was he was continuing to commit crimes, not just

evading excise taxes on imported tobacco, but continuing to operate an enterprise out of California where he evaded excise taxes on tobacco products moving out there.

Notably, your Honor, the defendant was the target of a forfeiture action in 2006 where his property, including real estate, vehicles, and cash were all seized and forfeited based on the defendant and his wife's involvement in an excise tax conspiracy.

I have copies of those pleadings, your Honor, but I mention them because it appears that the defendant since 2006 has not maintained any assets in his own name and has taken steps to conceal his assets and his income, including concealing his income from the court.

You'll note that in the Pretrial Services report, the defendant claims that he does not know how much money he makes per month. However, the defendant has recently sued the IRS over income taxes. So it's a little bit disingenuous for the defendant to claim that he does not know what his income is to this court when he is in litigation with the IRS over taxes due on that income.

Again in 2006 the defendant's property, cash and vehicles were all seized in a forfeiture action based in the Eastern District of California. The same type of charge the defendant is now facing here, excise tax evasion, and the same type of charge that he's being investigated for in the Eastern

District of California.

The indictment also alleges a number of techniques the defendant used to conceal his assets and his illicit payment for untaxed tobacco products, including approximately $120,000 in money orders which he used to pay for untaxed tobacco, and your Honor already pointed out the $700,000 in kickbacks that he received in exchange for participating in this evasion scheme with the importer, who I note has already been charged, has already been convicted, and is serving a term of seven years in prison.

For his part the defendant faces a significant prison sentence. A conservative guidelines range in this case is 97 to 120 months' imprisonment, and that is not factoring in any of his liability in California. That's purely what is charged in the indictment and the relevant conduct that he admitted to during the recorded interview. Again, approximately ten years of exposure.

THE COURT: Mr. Browne, can I ask you to specify for me, because I heard you describe several uncharged conspiracies, but to the extent you want me to consider criminal activity that is outside of this indictment, can you be more specific about the what and when occurred.

MR. BROWNE: Sure, your Honor. Shortly after Mr. Bryant, the importer who is named in the indictment, got in trouble with the federal government, Mr. Alrahib shifted to a

different model for evading excise taxes. He used a local importer who was tied to a manufacturer in the Dominican Republic. That tax evasion went on for about a year to a year and a half.

THE COURT: When?

MR. BROWNE: This was shortly after 2015.

THE COURT: OK.

MR. BROWNE: Thereafter, the defendant turned to an employee of his and set up that employee with his own importer's license so that employee could evade excise taxes on the defendant's behalf. That again is conduct that he admitted to in his recorded statement. And the employee -- I am going to decline to provide his name now --

THE COURT: That is fine.

MR. BROWN: But in short, your Honor, that scheme hosted a scheme with the Miami-Dade importer who was working on behalf of the Dominican manufacturer.

THE COURT: Let me clarify. You know about this scheme with the employee that occurred because the defendant described the scheme in his statement that was given in 2017 to law enforcement?

MR. BROWNE: We already knew about the evasion, your Honor; we just weren't sure the former employee of the defendant was actually working as an agent at his behest, which the defendant confirmed he was, and that he essentially learned

how to conduct this type of tax evasion from the initial conspiracy with Mr. Bryant. Again, misrepresenting the price that the defendant was paying for these tobacco products.

THE COURT: OK.

MR. BROWNE: Finally, and this conduct goes through the end of 2018, the defendant enlisted yet another corrupt importer to evade excise taxes. I believe that individual is based in the midwest. However, again, that individual was identified as the defendant, who again confirmed that he essentially ran the same scheme with that individual and misrepresented the price he was paying for tobacco products.

Notably, however, this was going on while the defendant was supposed to be debriefing with the United States, while the defendant was supposed to be cooperating with the United States. He was continuing to evade excise taxes on imports brought through this particular distributor, who is a friend and a former employee of the defendant.

THE COURT: What is his role in the most recent 2018 scheme?

MR. BROWNE: The defendant's role?

THE COURT: Yes. I understood you to say he taught a friend. I misunderstood you, I think.

MR. BROWNE: The defendant enlisted the importer and essentially showed him the methodology that was previously used by Mr. Bryant in terms of underreporting the price the

defendant paid for tobacco products from the Dominican Republic. So that would be the fourth conspiracy involved or to which the defendant has already admitted.

THE COURT: But did he benefit from the 2018 scheme? I heard you say that he taught him how to do it, but I still don't understand his role in the 2018.

MR. BROWNE: In short, the defendant buys tobacco products that are made in the Dominican Republic. He then resells them as a wholesaler tobacco distributor. The taxes on tobacco products are quite high, about 53 percent per large cigar. So in order to defeat the excise tax on these products and in order to compete in the marketplace, the defendant enlists these importers and teaches them to essentially create false documents and false paperwork to misrepresent the price that the defendant is paying for the tobacco.

So the defendant is paying in reality 7 cents. He submits documentation and the importer submits documentation to the government that says that he's paying 2 cents per cigar.

THE COURT: OK.

MR. BROWN: It's a considerable saving for the defendant and has allowed him to compete and to do quite well in this business.

THE COURT: All right. And the evidence that you have with respect to that scheme takes you to what date?

MR. BROWNE: Late 2018, your Honor.

THE COURT: OK.

MR. BROWNE: And of course I'm not up on all the specifics of the Eastern District of California's investigation, your Honor, but I can represent to the court that it involves the evasion of state excise taxes in California and it's been -- I've been told by the agents and the AUSAs out there that their loss, their tax loss, is approximately 8 to 9 million dollars based on the scheme that they're investigating this defendant for.

THE COURT: OK. Can you estimate the, since you're moving on risk of flight --

MR. BROWNE: Yes.

THE COURT: -- the total amount of ill-gotten gains that our defendant, you allege, has access to.

MR. BROWNE: The victim in this case is the United States, so we're talking $10 million that he saved by not paying taxes.

THE COURT: Which is relevant for guidelines purposes.

MR. BROWNE: Right.

THE COURT: But for purposes of risk of flight and demonstrating that he has access to some store of ill-gotten gains, can you estimate or represent the amount that the government alleges he has obtained and has access to for flight.

MR. BROWNE: Yes, your Honor. He is again, because

16

he's evaded these taxes to the tune of $10 million, that money went into his company and into his pocket. He is the president and CEO of the company that is named in the indictment, Trendsettah USA.

THE COURT: Wait a second. You're saying he evaded taxes to the tune of 10 million. That doesn't mean he was paid to the tune of 10 million. That's a loss he hasn't incurred.

MR. BROWNE: The money he saved, essentially, your Honor, by not paying taxes. So the court asked about ill-gotten gains. In the government's view the taxes that he should have paid and didn't pay are his gains from participating in the scheme.

THE COURT: Sure. I understand, Mr. Browne, and for purposes of sentencing that number will be highly relevant.

I'm limiting my inquiry at this point, and I'm not trying to otherwise narrow your proffer, just in terms of, for risk of flight, will there be an entry in my order that says defendant has access to X amount of assets as alleged by the government?

MR. BROWNE: By way of example, your Honor, it's very difficult to tell because the defendant has hidden all his assets in family members' and employees' names, including, as the Pretrial Services report reveals, a vehicle that the wife claims the defendant does not own because it's in her name.

It's the government's position, it appears clear, that

after 2006 when the defendant had all this property seized from him that he learned to not have assets held in his name.

THE COURT: OK.

MR. BROWNE: A search for assets shows no real estate in the defendant's name. He claims he pays about $8,000 a month in rent.

I will say, your Honor, that recently, in February, the Ninth Circuit Court of Appeals reinstated a verdict in favor of the defendant's company for $44 million. And again, this is a closely-held corporation. The defendant was the president during the course of the scheme. During the same time period, essentially, the defendant sued a competitor for antitrust violations in a court in California. The defendant was awarded a $44 million verdict in that case, which is obviously a considerable amount of money, that would go to the company. But as far as what defendant, what assets the defendant has, it is extremely difficult to tell.

THE COURT: OK.

MR. BROWNE: You certainly can't tell from the Pretrial Services report because the defendant told the probation officer that he does not know how much money he makes.

THE COURT: All right. I understand.

Is your proffer complete?

MR. BROWNE: Just let me review this quickly, your

Honor.

(Pause)

MR. BROWNE: I will note, your Honor, and obviously the court has not had an opportunity to review the defense's filing in connection with this matter with this bond, but one of the representations on page 1 of that filing is the defendant has no prior convictions. But the Pretrial Services report makes clear the defendant was convicted of battery with serious bodily harm, albeit in the late '90s.

This is a defendant who has a criminal history, who was sentenced to a term of three years' probation for that offense, and who furthermore has been the target of a forfeiture action, albeit a civil forfeiture action, that alleges point-blank that he and his wife were involved in a tax evasion conspiracy.

THE COURT: OK.

MR. BROWNE: Again, just so the record is clear, your Honor, we proffered the loss amount in this case because the sentence of ten years is considerable.

THE COURT: No, I understand that, Mr. Browne. I do.

MR. BROWNE: I appreciate that. I think that's all the facts that we want to set out in the proffer, your Honor.

We have an agent available for questioning if necessary.

THE COURT: Do you wish to inquire?

19

MR. SCHOEPPL: I do, your Honor.

THE COURT: Let's have him come forward.

MR. BROWNE: Special agent John Siddons.

JOHN SIDDONS,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: Speak into the microphone. State your name, spell your first and last name for the record and tell us where you're employed.

THE WITNESS: My name is John Siddons, J-O-H-N, S-I-D-D-O-N-S. I'm employed by the Internal Revenue Service, criminal investigation.

MR. SCHOEPPL: May I proceed, your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. SCHOEPPL:

Q. Agent Siddons, did you hear the proffer that the government made?

A. Yes.

Q. Do you agree with all the statements the government made regarding that proffer?

A. Yes.

Q. Is there anything that you would change?

A. I don't believe so.

Q. Is there anything that you would add?

A. At this moment, no.

Q. So let's go through some of the statements that were made during the proffer.

One of the statements that were made, if I heard the government correctly, was that my client, defendant Alrahib, had met with law enforcement in or about 2017. Is that correct, sir?

A. Yes.

Q. And isn't it correct, sir, that at that time he was made aware, in substance, that he may be subject to arrest?

A. Yes.

Q. And isn't it true that since 2017 and after Mr. Alrahib was made aware that he may be subject to arrest, he has never fled this country?

A. He has left the country dozens of times.

Q. But to answer my question, he's always returned, right, sir?

A. Yes.

Q. And in fact, on each of the occasions which the government claims there had been multiple departures to Mexico as an example, Mr. Alrahib returned to the United States on each and every one of those occasions, isn't that true, sir?

A. That is.

Q. And in fact, on the particular date in April in which he was arrested, he was actually returning to the United States,

isn't that right?

A. Yes.

Q. And in this particular case you would agree with me that Mr. Alrahib knowing that he was subject to arrest left the country to the Dominican Republic as well since 2017?

A. Yes. But I'd like to add that Mr. Alrahib, every time he was informed it's very likely he would get arrested, it came as a surprise to him every time. He was in a significant state of denial about this.

Q. But, Agent Siddons, regardless of whether Mr. Alrahib was in a state of denial or not, he was made aware of that fact by law enforcement, right?

A. Yes.

Q. And knowing that information, whether he was in a state of denial or not, he still returned to the United States, isn't that true?

A. I agree.

I believe that state-of-denial influence is a belief that he'd be fine to come back into the United States because he didn't believe anything was going to happen to him.

Q. And you've heard the government refer to a civil conspiracy matter. Are you familiar with that, sir?

A. Yes.

Q. And based on your familiarity with that you would know that Mr. Alrahib was never criminally charged with a criminal

22

conspiracy arising out of that particular matter, isn't that true?
A. Well, specifically which civil matter are you discussing?
Q. The matter I'm talking about is a matter that the government proffered. The government proffered that there was a 2006 civil resolution where property was forfeited.
A. Right. My knowledge of that is very limited.
Q. But you're not aware that he was ever convicted of a felony arising out of that, are you, sir?
A. For that, no.
Q. And in fact, in connection with that particular resolution of the 2006 civil conspiracy, Mr. Alrahib did not admit that he committed any form of wrongdoing, isn't that true?
A. I don't know. I don't know much about that case.
Q. So that part of the proffer that the government made you really can't speak to, can you?
A. Very minimally.
Q. Now, with respect to Mr. Alrahib, did you become familiar with his personal background?
A. Yes.
Q. And did you learn anything about this purported prior assault that the government mentioned in the proffer, sir?
A. I knew about the prior assault from the criminal record, and as we sit here right now, off the top of my head, I can't recall the specifics of that discussion.

Q. Wasn't Mr. Alrahib 18 years old?
A. I --
Q. You don't know that?
A. I don't know. No.
Q. Wasn't it a misdemeanor, sir?
A. I don't know.
Q. And do you know what the disposition was?
A. As of right now, no.
Q. Now, with respect to Mr. Alrahib's financial circumstances, he came back to the United States after these various trips that the government identified in the proffer, isn't that true?
A. Yes.
Q. With respect to the trips to Mexico, those trips to Mexico, do you know what the purpose of those trips were for, sir?
A. I'm unsure the purpose.
Q. Would it surprise you to learn that those trips --

MR. BROWNE: Objection. Counsel is testifying now, your Honor. He doesn't know the purpose. He testified to that.

THE COURT: Mr. Browne, it makes it easier for me to rule on objections if I hear the question.

What was the question?

MR. SCHOEPPL: Yes.

Q. Would it surprise you to learn that Mr. Alrahib was seeking to engage in a new business in Mexico?

MR. BROWNE: Same objection, your Honor.

THE COURT: Overruled.

Q. You can answer the question.

A. I'm sorry.

No, it wouldn't surprise me at all. No.

Q. Now, are you aware that Mr. Alrahib's married?

A. Yes.

Q. And you know he's a United States citizen?

A. Yes.

Q. You know he's not a citizen of any other country in the world other than the United States?

A. No, that I don't know.

Q. Do you know if he has children?

A. Yes.

Q. Do you know how many children he has?

A. I know it's at least two, and I know that he had recently had a child when we first met or was about to have a child.

Q. In fact, Mr. Alrahib has four children.

A. OK.

Q. Ten, 8, 3 and 1.

MR. BROWNE: Objection, your Honor. This is testimony from counsel.

THE COURT: Isn't the better source of the information the Pretrial Services report?

MR. SCHOEPPL: Your Honor, I can proffer that's

correct. I'm just trying to explore the knowledge of this particular witness regarding his background.

THE COURT: OK.

MR. SCHOEPPL: There has been a broad time period that's been stated here, going all the way back to Mr. Alrahib 18 years old.

THE COURT: Sure. If there is a relevance to whether or not this witness is aware of those personal facts, then please continue.

MR. SCHOEPPL: Yes.

THE COURT: If there is not, I'll look at the Pretrial Services report.

MR. SCHOEPPL: Yes.

Q. So, Agent Siddons, what I'm trying to get to is your knowledge of his personal circumstances.

You don't know if he in fact has four children today, is that right?

A. I remember we had a discussion about that. I don't remember the specifics. And in reviewing my notes, those were things I thought were extremely irrelevant in terms of catching myself up and rereading. There's a lot of information in this case that's significantly more relevant.

Q. And you understand that the reason we're here today is on a detention hearing by the government?

A. Yes.

Q. And do you know what Mr. Alrahib's ties are to the community?
A. I know he is a business owner, and as far as that goes I'd say nothing else of significance to mention.
Q. Right.
So you're not aware of him having any property that he owns outside the United States, are you?
A. So we did an extensive search and it was very bizarre that there was really nothing to find. We did find a property in Arizona. It looks like he sold that property. And we know that there's significant ties to the home on 841 North Clinton Boulevard in Mission Viejo, and we are in the process of figuring out what his actual interest is in that property.
Q. But my question was directed to international properties.
You're not aware of any international properties that the government claims Mr. Alrahib owns, is that correct?
A. When we spoke, he talked extensively about a business in the Dominican Republic that he was in control of. He had then -- he was 99 percent owner of that business, according to the records that we got from our attaché that oversees the Dominican Republic. We know there was a physical location and we know that he had employees that he directed to run that facility. We know that there were machines specifically sent to that facility, and we know that he had some type of control over that piece of property there.

27

Q. But you're not aware of Mr. Alrahib owns a home outside the United States, are you, sir?
A. At this time, no.
MR. SCHOEPPL: I have no further questions of the agent.
THE COURT: I do.
Could you flesh out what you just told me about a business, and did you say the Dominican Republic?
THE WITNESS: Yes. So there's a company that was established called Faast Holding, F-A-A-S-T. Throughout the years he's had various people take -- I guess the best way to phrase it is take over control of the business while he still held either ownership on paper or ownership using them as a nominee.
THE COURT: You said over the years. Can you give me a time frame.
THE WITNESS: I --
THE COURT: Is it current?
THE WITNESS: Oh, yes, it's current.
THE COURT: And the earliest that, as you sit here, you have evidence of him running this company in the Dominican Republic?
THE WITNESS: To be more accurate, I'd like to check my notes, but I would be confident to say 2016.
THE COURT: OK. And can you tell me the basis for

your knowledge that he has this company currently.

THE WITNESS: So we did some research when we cross-referenced importation documents and we saw that product was coming in from Faast Holding. We did some research on that. I contacted our attaché in Panama. He oversees the Dominican Republic. He pulled various documents for us, one of them being a contract that showed that when Mr. Alrahib first opened the business he was 99 percent owner of that business. Later we spoke with him regarding that business.

THE COURT: "Him" being?

THE WITNESS: Mr. Alrahib.

THE COURT: Mr. Alrahib.

When is later that you spoke to him?

THE WITNESS: At the interview, May 2017.

THE COURT: OK. So in 2017 you confirm with Mr. Alrahib --

MR. SCHOEPPL: Yes, ma'am. Yes, your Honor.

THE COURT: -- that he then owned and ran Faast Holding.

THE WITNESS: Yes. And he gave us a breakdown of where it was, how it was established, who was sending equipment down there, what type of equipment was being sent down there, the challenges he was running into. He told us about two or three different people that he's hired. He was paying for their apartment, their living expenses, and he would deal with

them, and he would --

THE COURT: Did --

THE WITNESS: I'm sorry.

THE COURT: It's OK. I cut you off.

Is part of the statement that he gave you in 2017 with respect to Faast Holding, did he reveal that it was then being used for any related illegal activity?

THE WITNESS: Yes.

THE COURT: OK. Was that participation in the tax evasion scheme?

THE WITNESS: It was the same scheme. It was with one of the several importers that he used, and this importer also knew of the scheme. He confirmed that in the interview, that this importer knew of the scheme.

THE COURT: OK. And what is the basis for your testimony that he continues to own and run it currently?

THE WITNESS: We have documentation that shows the same product at the same price which during our investigation we determined to be a fraudulently-lowered price is coming in from the same company through the same importer and it's being distributed by Mr. Alrahib.

THE COURT: OK. All right. With that, do you have followup questions to mine?

MR. BROWNE: Yes.

MR. SCHOEPPL: Yes.

30

THE COURT: Hold on, Mr. Browne. I'll finish with the defense and turn to you. Is that all right?

MR. BROWNE: Absolutely.

THE COURT: All right.

MR. SCHOEPPL: Yes, your Honor, I do.

BY MR. SCHOEPPL:

Q. Agent Siddons, are you aware that Faast Holdings -- that's spelled F-A-A-S-T Holdings, isn't that true?

A. Yes.

Q. You're aware that they filed federal income tax returns? Are you aware of that, sir?

A. No.

Q. You've never seen an income tax return that's been filed?

A. No.

MR. SCHOEPPL: I have no further questions, your Honor, of the agent.

I tender the witness.

THE COURT: Mr. Browne.

REDIRECT EXAMINATION

BY MR. BROWNE:

Q. Special Agent Siddons, you were asked questions about the defendant's ownership interest in the Dominican entity. Your understanding is that that entity is comprised of a manufacturing facility?

A. Yes.

31

Q. You also mentioned that there was an apartment in the Dominican Republic. Can you expand on that?
A. The extent of my knowledge on that is of the several employees that he put in charge of Faast -- and when I say several, I don't mean at the same time. He would have somebody run it. Something would happen. He would recruit somebody else. He indicated that for at least one of those employees, if not all, he would house them in an apartment, and I'm unaware at this time if he actually owned the apartment, but he would house them in the apartment, pay them a salary, and also just help them exist on the island financially.
Q. Do you recall seeing bank records that showed those payments for housing for employees in the Dominican Republic?
A. At this time I'd have to refer back to the bank statements.
MR. BROWN: OK. That's all I have, your Honor.
THE COURT: OK. Thank you for your testimony. You can step down.
THE WITNESS: Thank you.
(Witness excused)
MR. SCHOEPPL: Your Honor, under the Bail Reform Act the defendant should be released under the least restrictive condition or combination of conditions that secure his appearance, and in this case there's no evidence of risk of flight. In fact, the strongest evidence in this case is the fact that the defendant was made aware of his potential arrest

in 2017. He has come back to the United States each and every time he's left the United States.

He also has circumstances that are far less significant than other cases where this court has granted bail. For example, in our papers we filed the Bagios case, a Greek citizen who was residing in Switzerland. Bail was granted in that case. The Kaplowitz case, which was a case in which there was extensive foreign travel, significant financial assets, advisory guideline range of life imprisonment. Bail was granted in that case.

The Melgen case, which is cited in our papers, your Honor, a doctor and a $100 million fraud facing life imprisonment, had substantial ties to the Dominican Republic, had a private jet and a yacht and he lied in his pretrial disclosures. Bail was granted. Pretrial detention denied.

The Javat case, your Honor. Mr. Javat was a citizen of Pakistan and St. Kitts. He resided primarily in Dubai for 23 years. He was not a U.S. citizen, facing a guideline range of 108 to 135 months. Pretrial detention was denied. Bail was granted.

In the Giordano case, where Mr. Giordano was facing significant prison time, one of the key considerations that the court made in that case, which are also present here, is a defendant is presumed to be innocent until proven guilty at trial.

This is bail. This is not a trial.

Mr. Alrahib has submitted 18 letters of support. Today in the courtroom, your Honor, if I can ask -- we have 12 people that have come from different parts of the country to be here, including locally and elsewhere, California.

If you could please stand.

This is a showing of some of the support from friends and family members in the community. We've given you 18 letters from various individuals. Out of the group that's here, 11 of the 18 letters are represented by the folks that are in this courtroom today. They include, among others, people involved --

THE COURT: You can be seated, folks. Thank you.

MR. SCHOEPPL: They include, among others, people involved in his church. He's a member of a Greek church. He lived in South Florida for a number of years. Represented today there is a priest that's here, Father Joseph is here in the courtroom.

If you could just stand for a minute.

THE COURT: Thank you, sir.

MR. SCHOEPPL: And some of the letters that you're going to see are an outpouring of affection and regard for Mr. Alrahib. And those types of ties are pretty important here in this case, because two of the people -- one of the people in the court today, Martin Patrick Kerrins, who is a retired law

enforcement officer, who is Mr. Alrahib's uncle, has offered to pledge property that has no connection to any of the allegations in this case, that in this case Mr. Kerrins, who is Uncle Kerrins to Mr. Alrahib --

THE COURT: Do you want on spell that last name?

MR. SCHOEPPL: Yes. It is K-E-R-R-I-N-S.

THE COURT: Where is the property located?

MR. SCHOEPPL: The property that he has offered is located -- I'll tell you in one second.

THE COURT: In what city and state?

MR. SCHOEPPL: I'll give it to you in one minute.

THE COURT: It's OK. We are not actually there yet. I was just trying to keep up with you as I was taking my notes.

Your proffer is premised on your argument that there is no evidence of risk of flight, and I know that Mr. Browne wants an opportunity to correct what I missed, but at a minimum there is a history of secreting assets, strong ties abroad, including an ongoing business that there is evidence of ongoing fraudulent illegal conduct with, continuing unlawful conduct after confrontation by law enforcement, and an absence of ties to the South Florida community.

Mr. Browne, that is not intended to be exclusive of the proffer that you intend to add.

But at a minimum when you say there is no evidence of risk of flight, I am going to just tell you that I disagree.

MR. SCHOEPPL: Well, your Honor, he has four children, 10, 8, 3 and 1. He has been married for over 20 years -- over ten years. 13 years. He's been together for over 20 years with his present wife. They have a home in San Diego.

I can tell you that the proposed bail package that we've proposed in this case includes over $2 million in property secured. There's two properties by Martin Patrick Kerrins and there is one property by George Antar, who is also present here in the courtroom. The collective value in equity of the three properties is $2,157,000. They're prepared to offer those to secure his appearance in court.

Mr. Alrahib is also prepared to surrender all travel documents. He did surrender a passport, and his wife found an older passport that had holes in it. I have that and I could surrender that to the government here today.

He is prepared to execute an irrevocable waiver of extradition. He's prepared to submit to electronic monitoring. He's obviously going to report regularly to Pretrial Services.

Now, his preference would be to be able to be permitted to be home with his family, but, your Honor, if the court is so inclined and wants Mr. Alrahib to be here in the Southern District of Florida, Charles Khoury and Haifa Khoury, Charles Khoury is an ordained subdeacon of St. George Cathedral here in Coral Gables. They are prepared to house Mr. Alrahib. Their address is 1001 Bella Vista Avenue in Coral Gables. If

it is necessary, your Honor.

If we need to agree to a curfew, we need to agree to home confinement, we will agree to all of those things, if necessary. But we believe that the combinations of conditions that we've proposed will assure Mr. Alrahib's attendance and presence at all court proceedings in this case, and we request that the court revoke the order that was entered in California, which was not supported by any finding of any kind to show flight risk.

The issue with access to money or committing crimes, the government has to prove that. That goes to the Giordano case -- every person that's charged with a crime is alleged to have committed a crime. If you accept the government's proposition, any defendant that's charged with economic crimes should be pretrial detained.

Now, in this case during the entire time period that Mr. Browne has articulated -- he's only been charged with the present case. That's the only case before the court. These other alleged uncharged crimes haven't occurred.

While we are on a break my cocounsel handed me a stipulation from the 2006 civil forfeiture, and in that document, your Honor, in the actual stipulation itself, paragraph 11, it states: This stipulation for compromised settlement is not, is in no way intended to be, and should not be construed as an admission of guilt or criminal culpability

37

on the part of the claimants. This settlement is entered into by plaintiff, the claimants, with the purpose of compromising disputed claims under 18, U.S.C., Section 981 and avoiding the expenses and risk of further litigation.

The government should not be granted any type of fiat to add some greater punishment in the form of pretrial detention against Mr. Alrahib for uncharged crimes. In fact, the fact that he is charged with a crime, he's entitled to bail. We have proposed conditions in combination under the Bail Reform Act that we believe will satisfy his appearance.

The statements that Mr. Browne has made are nothing more than speculation because he's charged with such a crime. What about the other defendants in the other cases where bail was granted when they are facing life in prison. Yes, Mr. Alrahib is facing a potential substantial sentence, but so were all the other economic crime defendants in each one of the cases we cited in our brief, your Honor, and we believe that based on those authorities that bail should be granted in this case on behalf of Mr. Alrahib.

THE COURT: What about the $44 million verdict that was just reinstated?

MR. SCHOEPPL: Yes. Well, that is a judgment that is currently -- a stay has been entered for the Ninth Circuit and we understand a petition of certiorari is being made to the U.S. Supreme Court. So those funds are not available.

It's our understanding, and I will proffer this to the court, that there are liens and other persons that stand to get ahead of Mr. Alrahib in terms of any entitlement to monies out of the proceeds of the payment of that judgment, and it's our understanding that the net proceeds that he may receive after all the debts are paid is approximately $2 million at the end of the day.

THE COURT: OK. But notwithstanding, I want to understand the chain of money should the stay be lifted and the judgment be paid. It would be paid to a company that he owns outright and has full control over?

MR. SCHOEPPL: He has partial control over it, your Honor. There are other parties that are shareholders in the company. Right now he is a minority shareholder.

THE COURT: What is the name of the company?

MR. SCHOEPPL: That is the Trendsettah company, your Honor.

THE COURT: OK. Oh, that is named in the indictment.

MR. SCHOEPPL: Correct. And there is no issue that these monies are ill-gotten. This was an anticompetitive lawsuit. There is no issue -- in fact, if the court needs to have comfort, we are prepared to offer some form of restriction to be placed on the proceeds from the Swisher judgment if we need to do that. That way the court will have further assurances that those funds won't be used to spirit away

Mr. Alrahib.

THE COURT: OK. Mr. Browne, your turn.

MR. BROWNE: Your Honor, to put it simply, bond is about trust, and I don't know how this court can trust a defendant who tells the court that he doesn't know what his income is, where it wasn't until right now where the court found out that he's got a $44 million judgment coming to his company. That didn't come from the defendant, your Honor, because the defendant is not honest. He doesn't want the court to know about his assets because that hurts his case to get out on bond. This court should not trust this defendant.

As far as speculation about these charges, the standard in this case is preponderance of the evidence. Is it more likely than not that this defendant could flee to the Dominican Republic or Mexico. He certainly has the assets to do it. But with respect to Mr. Schoeppl's suggestion that this is all speculation, this is a hundred page transcript of the defendant laying out his criminal culpability in great detail.

There is no speculation there, your Honor. This is in black and white. The defendant committed these crimes. He told the government about it, and then when he tried to cooperate, he continued to commit crimes thinking he would never have to pay the price.

This is a defendant who is a risk of flight. This is a defendant who has not earned the court's trust. And first

and foremost in the court's mind I think should be the fact that he's lying to Pretrial about his assets. He doesn't own a home, he doesn't own vehicles. That's what he's claiming. I don't think the court can trust this defendant, your Honor, and that's really what the bail decision is about, is whether your Honor can trust this defendant to appear in court as required.

I'm sure there are other economic crime cases where bail has been granted, but this is about this case and this defendant who has committed a number of crimes since 2014, some of which are charged in the indictment, others he's admitted. The fact is this court should not trust this defendant. This court should detain him pending trial before Judge Moreno.

THE COURT: I understood that one of the three properties you proposed in your bond security package to be that of the defendant's. Am I wrong?

MR. SCHOEPPL: I'm sorry. Repeat that, your Honor.

THE COURT: I understand that the three properties you were proposing putting up as collateral for a bond, one of those was the defendant's property. Is that not correct?

MR. SCHOEPPL: That's not correct. The three properties, they are on page 19 of our motion.

The first property, which is George Antar's property, is located at 4131 Van Dyke Avenue in San Diego, California. That is Mr. Antar's property. I have him available in the courtroom. I can put him on the stand, your Honor, and we can

go through it. It's fine.

But I can proffer to you that Mr. Antar would testify that the property has a tax appraised value of 1.78 million. He did not acquire it with any money or proceeds from anything coming from Mr. Alrahib. There's a mortgage of approximately 366,000. It's got equity of 1.4 million.

THE COURT: Respectfully, we are just not there yet.

The defendant's skin in the game with respect to your proposed bond is what?

MR. SCHOEPPL: Well, his skin in the game, you know, we have a variety of factors. One is an ankle monitoring. He's prepared to do that. He's prepared to sign an irrevocable waiver of extradition. No problem doing that, your Honor. If the court were to allow him to be with his family and four children, he would agree to home confinement. He would do that. That shows a lot of skin in the game to do that. And he also obviously would agree to a curfew. If he is at home he wouldn't need it, but if he wasn't at home, he would do it.

If the court would not permit Mr. Alrahib to be with his family, he would agree to live here in the Southern District of Florida with the Khourys. And he would agree, if necessary, to home confinement there, to ankle monitoring, and any other conditions the court would impose that enables him to be free.

THE COURT: All right. Mr. Browne, I'll tell you

that, frankly -- two things. First of all, your burden is to show that he is a serious risk of flight, right? We're traveling under 3142(f)(2).

MR. BROWNE: That's correct, your Honor.

THE COURT: And my obligation is to hold him only upon a determination that there is no combination that would reasonably assure his presence in court again.

I want to make sure that I understand what you are relying on because it seems to me that a combination could be set with a corporate surety bond, GPS monitoring, and significant collateral. So I understood a large part of your argument to be that because he lied to the court in saying that his income was unknown.

MR. BROWNE: Also, your Honor, he also just doesn't disclose what his assets are to the court. The court has no basis for -- to answer the question that you posed to me which is what kind of money does he have to take off, and you won't learn that from the defendant because, again, he's not being honest. It's not just that he lied about his income, your Honor; he also didn't disclose the fact that he owns property in the Dominican Republic.

On page 7 of the defense's pleading, in footnote 4, they claim that Mr. Alrahib has an interest in a separate venture that involves the manufacture of tobacco products in the Dominican Republic.

THE COURT: Where are you reading from? I'm sorry, Mr. Browne.

MR. BROWNE: That is the pleading that was filed at 10:30 last night.

THE COURT: What page?

MR. BROWN: By the defense. Docket entry 12, page 7, footnote 4.

THE COURT: OK. Let me get where you are.

(Pause)

THE COURT: OK. Go ahead.

MR. BROWNE: Your Honor heard evidence that he owns property in the Dominican Republic. Your Honor heard evidence that he owns residential property in the Dominican Republic where he pays for residential property in the Dominican Republic, where he pays on behalf of his employees. Where is that disclosed in the Pretrial Services report?

THE COURT: But it's disclosed in the defendant's own motion. So there is no attempt to conceal it. So I'm not following your argument with respect to the property in the Dominican Republic.

MR. BROWNE: Ultimately, your Honor, it's not the defense lawyers who are going on bond. It is the defendant, who you have to decide whether he is a serious risk of flight or not, and the defendant didn't disclose any of this property when he spoke to the Pretrial Services officer. That should be

44

of concern to the court. Because again, it doesn't help him to disclose that he has property in the Dominican Republic that he owns. So of course he didn't tell Pretrial about it. He didn't tell Pretrial about his assets because he knows that those make him more likely to be a risk of flight.

Now, the defense did the right thing. In full candor they admitted again at 10:30 last night in a pleading that your Honor hasn't seen that he does own property in the Dominican Republic. But I'm bringing it to the court's attention because that is something that was discussed during the agent's testimony, the fact that he paid for employees that had an apartment, at least one apartment in the Dominican Republic. That's something he told the agents about, and I will proffer to the court that we have seen financial records to corroborate that.

Again, if the court is to trust this defendant, how can the court trust a defendant who is not going to tell the court about property that he owns outside the country. That is a substantial tie, your Honor.

He told the court that he's been to the Dominican Republic over a hundred times, but he didn't tell the court that he owned property there. I mean, that's a serious risk of flight, your Honor. It's a risk at the end of the day that the court has to decide, whether there is a risk or not.

The evidence here does support a serious risk of

flight. This defendant could go to Mexico or to the Dominican Republic where he has business interests and where he apparently owns property. But again, but for counsel's candor in admitting this in a pleading that was filed late last night the court wouldn't know that he owns property in the Dominican Republic.

It's hard to believe that this defendant does not pose a risk when there is no candor from the defendant to the court.

MR. SCHOEPPL: Your Honor, I will note this. On October 26, 2018 the defendant filed a Form 8938 with the Internal Revenue Service where he disclosed another foreign asset, which was Faast Holdings, LLC, which is this very same entity that he owns an interest in. So he had absolutely no concealment at any time on this to the government.

We don't know how the questions were framed to Mr. Alrahib. We don't believe they framed the questions in such a way that called for --

THE COURT: Who is "they?"

MR. SCHOEPPL: The Pretrial Services officer that interviewed Mr. Alrahib. We don't know exactly what questions they asked, but it's my understanding that he wasn't asked this question about foreign assets like this. But it is disclosed. He caused this filing to be made with the Internal Revenue Service. I have a copy, which I can mark as Defendants' Exhibit No. 1 and hand it to the court if you would like to see

46

it, which shows, before he ever was indicted, disclosure of this information, which debunks the government's notion that he was concealing it.

THE COURT: Is there any chance we have the handwritten forms the officer made when the interview was conducted?

MR. BROWN: The officer would have that, your Honor. It would be in the office.

THE COURT: Let me look. OK. I want to see the handwritten form. I'm going to take a two-minute break to reach out to the Pretrial Services officer and we'll be right back.

MR. SCHOEPPL: Thank you, your Honor.

(Recess)

THE COURT: All right. So the argument was raised that the defendant lied to Pretrial Services and the counterargument being we don't know how the questions were made.

So now that we all know what questions were asked of Mr. Akrum -- I'm sorry, Mr. Alrahib, we see only the indication that he's a self-employed tobacco distributor for the last 17/18 years and that the past three or four years have not been good.

MR. SCHOEPPL: Your Honor, that's correct. We have a tax return for 2017 which shows that he has an adjusted gross

income of a negative 3.9 million, and that was filed with the IRS. So that is correct. That's the same tax return disclosed as Faast in the Dominican Republic, his interest in it.

MR. BROWNE: Judge, if I may.

THE COURT: Yes, of course.

MR. BROWNE: He's involved in litigation with the IRS over that tax return. That's something I proffered previously. I don't think that that should be taken as gospel truth, your Honor.

Again, no mention of the $44 million verdict, no mention of any holdings, business or otherwise, abroad. No mention of a residence or an ownership interest in any vehicles.

THE COURT: But I'm looking -- that's why I got this, Mr. Browne, because I'm trying to figure out where either the judgment owed to or anticipated to be received by a company in which he's a shareholder, right? That's the relationship?

MR. BROWNE: He is the president and owner of that company, your Honor.

THE COURT: OK. I understood the proffer to be that he was a part owner or something.

MR. BROWNE: That was the defense's proposition, which I don't know if it is supported by anything. But our understanding is he is the president and owner of that company. Most of the other officers of that company are members of his

48

family.

THE COURT: OK. As I go through each category in this worksheet, I don't see one, but you both have copies, as does my Pretrial Services officer, so someone will correct me if I'm wrong.

MR. SCHOEPPL: Your Honor, Carl Schoeppl on behalf of the defendant.

I don't see a category that called for that.

THE COURT: I hadn't finished my thought, which was the category that would disclose either an anticipated judgment or his interest in a property or other business being operated abroad.

Mr. Browne.

MR. BROWNE: Well, your Honor, there is clearly, on page 5, there is a space for any land that's owned, and of course there is nothing disclosed there. Land location, purchase date, purchase price, fair market value.

MR. SCHOEPPL: He doesn't own any land, your Honor. It is a business interest.

THE COURT: That was how I understood the testimony from your agent as well, Mr. Browne, that he owns the business. But I thought your agent said that he did not have evidence or information of a property that was owned there.

MR. BROWNE: Well, again, per the defense's own filing, they disclosed that he owns this separate venture that

49

involves the manufacture of the tobacco products in the Dominican Republic. Whether or not he owns the actual real estate itself, I don't know definitively, your Honor. But again, that business interest isn't disclosed nor is the value of the company nor is anything other than $60,000 in total net income, total net worth.

THE COURT: Trust me, I understand and I share a concern about lying to Pretrial Services, but that is why I'm reviewing this with you. Because if you point me to the place where you think he should have indicated the other business that he owns, then it will make it more meaningful for me to make a finding as to whether or not he did lie to Pretrial Services. As I sit here, the omission is not obvious to me, Mr. Browne.

MR. BROWNE: He didn't even disclose the name of his company, your Honor.

THE COURT: Where?

MR. BROWNE: On page 3 where it says "current employment/unemployment." It says he's self-employed.

He's the president of a large tobacco distribution company. He didn't disclose the name of that company. He didn't disclose his income. He said, well, it hasn't been good for the last three or four years. That's because he's been under criminal investigation.

But, your Honor, to not even disclose any income

whatsoever, how can the court rely on that representation to determine whether he has the assets to flee. Literally he provided no information whatsoever about his income. None. That is a misrepresentation by omission, especially when he has an ongoing suit against the IRS over his income, your Honor. I mean, this is clearly hiding information from the court. To say as the president of a business -- actually, as the president of several businesses -- that he has no idea what his income is on a monthly basis, that's not candid, your Honor.

MR. SCHOEPPL: And, your Honor, we're not aware of any litigation regarding the 2017 return. I'd like the government, if you have a proffer to make on that.

MR. BROWNE: Your Honor, I have a docket sheet for Akrum Alrahib v. Commissioner of Internal Revenue. It is a U.S. tax number, a 020812-17. Because it is a tax matter the docket is sealed, but the case is ongoing according to the docket.

I can hand up a copy to the court.

THE COURT: I don't really need it. If you want to make it an exhibit to the hearing, it will be admitted.

Mr. Browne, ultimately I do understand your position with respect to the failure to specify or to disclose an income. The problem that I have in putting essentially all of my eggs in that basket is I see that in about half of my Pretrial Services reports. It's not a standout -- I understand

it is a standout fact for you and for this defendant, but for this court it's not. It's incredibly common.

I would not base a finding that the government has demonstrated by a preponderance of the evidence that he poses a serious risk of flight on his failure to disclose his income when he did disclose the fact that he is a self-employed business owner and has been for 17 to 18 years and identified other assets and liabilities, and his wife verified what is in the marital, I don't know what to call it, lineup of assets or liabilities. Ultimately I just don't think that's a preponderance. I do think that there are conditions that can be set.

If you want a written order, I will prepare one. But ultimately what is most meaningful to me is how long ago this conduct is alleged to have occurred -- 2014 -- that he has had contact with law enforcement in 2017, and, as your agent testified, been warned multiple times that he'd be arrested. Notwithstanding the contact with law enforcement and the knowledge that he was under active investigation and awaiting arrest, he continued to come and go from the country. There just has not been anything that I can sink my teeth onto that demonstrates a risk of flight here with respect to his behavior.

I agree with you with respect to the assets. I find the $44 million verdict to be something that has to be dealt

with, but I still think it can be dealt with. So ultimately I do think that there is a combination of conditions, which will start with a corporate surety bond. We will have a bondsman who has skin in the game and an incentive to follow up with Mr. Alrahib should he not appear at any point.

I see your hand up, Mr. Browne.

MR. BROWNE: No, your Honor. Just as a practical matter in terms of fashioning a bond, I imagine, given the defense's proffer about properties, the potential for corporate surety, it's my office's intention to seek a stay of this bond so that we can appeal it to Judge Moreno. So if the court wants to fashion a bond now, we can certainly do that. We have some conditions to recommend, but I just wanted the court to know ahead of time that we probably will seek an appeal of this pretrial detention order from your Honor to Judge Moreno. We should be able to file that notice within a couple of hours.

THE COURT: OK. For how long are you seeking a stay?

MR. BROWNE: I believe until the end of the day. Mechanically we'll have to file something, and I'll give Judge Moreno's chambers a heads-up immediately that we intend to appeal, and then we can obviously file something for Judge Moreno's consideration in writing based on the direction that we get from chambers.

THE COURT: OK. So you're seeking a stay until the end of the day and you intend to file a notice of appeal then?

MR. BROWNE: By close of business at a minimum, your Honor. Then I can be in touch with Mr. Schoeppl about what Judge Moreno's preferences are in terms of having a hearing right away or considering written pleadings.

Moving forward, we obviously do not want to delay this any further than necessary given your Honor's inclination to give a bond in this case.

THE COURT: OK. Well, if we are going to go ahead and set special conditions, Judge Moreno has to weigh those as part of his review of the order. So with respect to the monetary portion -- actually, you know what I am going to do, Mr. Schoeppl. There is a grand jury that is waiting to make return and a courtroom full of people who have other hearings.

MR. SCHOEPPL: Yes.

THE COURT: So knowing that we're not quite done with you, I'm going to ask you to have a seat for a few minutes.

MR. SCHOEPPL: Sure, your Honor.

THE COURT: To the extent that you and Mr. Browne are in a position to jointly, notwithstanding your position on the appeal, if you have the ability to work out what you would recommend, let me know that and let me take the grand jury and I'll recall your case. OK.

MR. SCHOEPPL: Yes, your Honor. Thank you.

(Recess)

THE DEPUTY CLERK: Recalling United States v. Akrum

Alrahib, case No. 19 20165, criminal, Judge Moreno.

THE COURT: All right. Everyone else can be seated. Sorry.

We called you back up to set conditions of bond. Now understand that between 10:30 last night and now I still have not read the motion.

MR. SCHOEPPL: Understood, your Honor.

THE COURT: So I don't know what your bond package is --

MR. SCHOEPPL: Right.

THE COURT: -- other than you have directed me to where you indicated that the property owners were identified.

MR. SCHOEPPL: Yes.

THE COURT: So let me just hear first your proposal.

Mr. Browne, let me just say at a top level, nothing that you say at this point in my mind prejudices your position on the appeal.

MR. BROWNE: I appreciate that, Judge.

THE COURT: But I do just want -- I always look to my AUSA for input on conditions of bond notwithstanding that they think the right bond is pretrial detention.

MR. BROWNE: Understood.

THE COURT: OK. So let me hear first, please, Mr. Schoeppl.

MR. SCHOEPPL: Yes. So I am going to give you

everything with the pledged property at the end.

First, surrender all travel documents.

THE COURT: Let's start with the money amount, the proposal on the money.

MR. SCHOEPPL: The proposal is a $2 million personal surety bond secured by three properties, and I have two different parties here from out of town. George Antar that's available here to swear out and answer questions regarding the property that he's prepared to propose, which is the 4131 Van Dyke Avenue, San Diego.

THE COURT: Sorry. We will get to the details of the properties.

MR. SCHOEPPL: OK.

THE COURT: But I want to try to get to a place where we at least know what bond.

MR. SCHOEPPL: Sure.

THE COURT: So bearing in mind that I'm going to impose a significant corporate surety bond, which is going to require him to post 15 percent --

MR. SCHOEPPL: Understood.

THE COURT: -- and I don't know if you're taking that into account by also proposing a $2 million personal surety bond.

MR. SCHOEPPL: Well, what we would propose to do would be to use the 2 million and then break it up. I don't know

what the court has in mind for the amount of the corporate surety bond, but whatever the amount the court is thinking of for the corporate surety bond --

THE COURT: That is not what I do. I always listen to the parties.

MR. SCHOEPPL: What I would propose is a $500,000 corporate surety bond and a $1.5 million personal surety bond cosigned by the parties that are here today.

THE COURT: OK.

MR. SCHOEPPL: That's the first part of the bail package.

THE COURT: OK. Let me -- and the three property owners are all here?

MR. SCHOEPPL: Yes.

THE COURT: All right. So let me just go piece by piece and ask you -- sorry, Mr. Browne.

MR. BROWNE: No, Judge. I'm sorry. I'm doing the calculation on what the bond premium would be for the corporate surety bond and we would insist on a Nebbia condition, again, not waiving our arguments for detention.

But again, based on the recommendation of defense counsel we would insist on a Nebbia condition with respect to the corporate surety bond.

I don't know that I need to hear testimony on the source of the funds that paid for the properties on the $1.5

million personal surety bond. My concern is with the cash.

I noted in the Pretrial Services report there are firearms at this defendant's residence. We need some clarification where exactly he's going to be residing, whether it is going to be here in South Florida --

THE COURT: I think the Nebbia condition is reasonable under the circumstances of both the crime and the basis of the government seeking pretrial detention being largely based on the absence of known assets. I think the Nebbia condition is reasonable and I'll impose it.

Is there anything that you wanted me to consider with respect to the amount of that corporate surety bond having done the math on the premium?

MR. BROWNE: We think that the $500,000 corporate surety bond is reasonable in combination with the $1.5 million bond secured by, I believe it is three properties, two property owners, is my understanding.

MR. SCHOEPPL: That's right.

THE COURT: I agree. So then I'm looking at the motion at page 19 and it lists the three properties. They are owned by Mr. Antar and Mr. Kerrins. One is located in California and two are houses that are located in Illinois. Correct?

MR. SCHOEPPL: That's correct, your Honor.

THE COURT: Did I read this right?

MR. SCHOEPPL: Yes.

THE COURT: All right. OK. I am going to ask to hear from both Mr. Antar and Mr. Kerrins in a moment.

Before I do, I want to also talk about special conditions.

Now, it's been requested that he continue to live at home in San Diego. I just wanted to confirm. Pretrial Services in fact included that recommendation, and that the travel be extended. Normally travel is restricted to the district where your bond is imposed and your case is pending.

In this case, and I'll hear argument, Mr. Browne, but my inclination is to have him continue to reside at home and live with the deacon he identified when he's in town for court appearances. He has demonstrated an ability to pay for travel back and forth and I would rather have him in the familial home with his children pending the case than here.

Do you want to be heard on that point? And I am going have GPS monitoring.

MR. BROWNE: The problem there, Judge, is the firearm in the residence.

MR. SCHOEPPL: We will surrender them.

MR. BROWNE: If I could just finish, Mr. Schoeppl.

That would be my primary concern. Apparently there is one firearm at the residence and one firearm is at the police department. I don't know what the story is with that firearm.

With respect to other special conditions, given the allegations in the indictment and the evidence in this case --

THE COURT: Yes.

MR. BROWNE: -- we believe that a related concern restriction is absolutely appropriate.

THE COURT: What do you mean by that?

MR. BROWNE: Related concern meaning no business in the tobacco industry --

THE COURT: OK.

MR. BROWNE: -- where the defendant claims to be self-employed.

You've also heard evidence that he is the president of a large tobacco distribution company. He should not be working in the tobacco industry based on the proffer and the allegations in the indictment. He's been evading excise tax in connection with his work in the tobacco industry.

So the firearms and the related concern restriction and the Nebbia are the big points of contention for the government with respect to the bond.

THE COURT: Mr. Browne, isn't the related concern -- tell me that I'm wrong -- importation? It seems if you were to start importing alcohol instead of tobacco, would that be consistent with my bond? What is the greater concern? If he is selling tobacco within the United States it seems to me --

MR. BROWNE: Tobacco is the concern, Judge.

THE COURT: So it's not a question of importation, it's a question of tobacco.

MR. BROWNE: That's our concern, yes.

THE COURT: I want to make sure that I understand it, that's all.

MR. BROWNE: There are a number of other products that this company sells that are marijuana related. They include things like vaporizers and eyedrops and other things that may or may not be covered. But I think that specifically our concern is with the importation of tobacco and the distribution of tobacco to states such as California, where he's also being investigated for evading excise tax there. So we think that just a prohibition on being in the tobacco business is sufficient.

THE COURT: OK. Now query, because that's personal to him. What do you propose with respect to how we would fashion that condition and his companies?

MR. BROWNE: Well, your Honor, the company is not charged.

THE COURT: Exactly.

MR. BROWNE: The company is listed in the indictment. I don't know that the court has jurisdiction to limit the company. But this defendant can't be involved in that company's business insofar as it deals with tobacco.

THE COURT: OK. I hear you, Mr. Browne. I

understand.

So then the condition of my bond with respect to residence is you will continue to live in the Southern District of California address, the 7991 Entrada De Luz West. Is that right? So you'll be supervised out in California by those officers when you're there and you'll have to report to Pretrial Services in both districts. But when you're here you will be responsible to these officers, but primarily to your California officer.

I agree with Mr. Browne that as a condition of bond you'll surrender any firearms, not possess any firearms, not obtain any new ones.

Do you have a carry and conceal permit?

THE DEFENDANT: No, ma'am.

THE COURT: You will surrender any travel documents. You will not obtain any new ones while you are on this bond. While you will be permitted to travel back and forth between the Southern District of Florida and California, that is it. That's the only travel that you are permitted. So obviously nothing outside of the country. But any travel that would require you, for example, to land in Texas requires modification of bond, and you'll have to check with your probation officer.

Do you understand the travel limitation I'm imposing?

THE DEFENDANT: Yes, ma'am.

THE COURT: And then I'll hear from you, Mr. Schoeppl, if there's argument or opposition, but I agree with Mr. Browne on the related concern, particularly in light of that $44 million judgment that may or may not be coming into one of his companies.

MR. SCHOEPPL: Yes. The only carveout I would just request would be with respect to the Mexican business. It's a glass manufacturing company and it's glass-related products that they're making in Mexico because the labor, and those are being brought into the United States. Those aren't tobacco importing type things but they relate to tobacco products in the sense that they are for tobacco-related products.

THE COURT: I can't tell if you're asking me to carve out from the related concern condition that he be able to continue his business with the glass products.

MR. SCHOEPPL: Yes.

THE COURT: I understood Mr. Browne's concern to be tobacco. So it wouldn't seem to me to fall in the request.

Mr. Browne.

MR. BROWNE: They're tobacco pipes, is my understanding. They're paraphernalia for whatever purpose. I don't know that that falls within the tobacco industry in general. My inclination is that it does if it is meant for the purpose of tobacco.

The court already raised a concern about importation

and I think it's just more specific to say it's a tobacco-related concern restriction as opposed to one that touches all importation. But the government's position, for what it's worth, is if we are talking about products used for tobacco that that would fall within the tobacco industry related concern restriction.

THE COURT: So I am at a disadvantage factually. I don't know. So with that, and recognizing that these are in the scheme of things pretty reasonable conditions that the government is seeking, what's your position?

MR. SCHOEPPL: Your Honor, we understand. He'll agree to them.

THE COURT: OK. All right.

MR. SCHOEPPL: Thank you.

THE COURT: So we will impose -- I never heard it called that, but now I am going to say it all the time -- a related concern restriction limiting his employment to prohibit employment and activities in the tobacco-related industry while on bond.

Let me just tick through and see if there is anything we missed.

GPS monitoring. Now let me ask Mr. Schoeppl, with that limitation on his employment, is it your expectation your client is going to work while he's on this bond?

MR. SCHOEPPL: We haven't discussed that. I don't

know if he will be able to work in the -- obviously he won't be able to work in the same tobacco-related industry that he's been involved in.

THE COURT: Right.

MR. SCHOEPPL: So I don't know. We haven't discussed that.

THE COURT: OK. Because I'm considering a home confinement condition and that's why I'm asking.

I see your client's already nodding.

MR. SCHOEPPL: He'll find something else to do and if the court is inclined to impose home confinement, we would obviously reserve the right to seek permission for him to work.

THE COURT: That is how I would prefer to do it. I would rather have him start on home confinement.

MR. SCHOEPPL: Fine.

THE COURT: In the event that there is employment that is sought, move to modify the condition of the bond.

MR. SCHOEPPL: Yes.

THE COURT: And that way we have the ability to let Mr. Browne assure himself that the employment doesn't violate the carveout or, rather, the related concern.

OK. So home confinement and we already said GPS to be paid for by the defendant.

MR. SCHOEPPL: Yes, your Honor.

THE COURT: OK. Those are all of the conditions I

have. What did I miss?

MR. BROWN: Your Honor, I'm not sure if you mentioned surrender of passports.

THE COURT: I did, but it warrants saying twice.

MR. BROWNE: And any property not to be encumbered.

THE COURT: I am going to get to the property when I get to the property owners. But yes, the three properties that are being used to collateralize these, the personal surety bonds, shall not be encumbered during any time of the bond.

MR. BROWN: And any allowances.

THE COURT: For the home confinement.

MR. BROWNE: Yes.

THE COURT: Mr. Schoeppl, let me hear from you, but other than -- allowances on home confinement other than medical appointments, meeting with the attorney, court appearances or any other allowances that are sought.

MR. SCHOEPPL: Just his children, your Honor, and church, if that's possible.

THE COURT: Religious services are an allowance.

But when he says just his children, what does that mean?

MR. SCHOEPPL: Well, they have a community center where they go and he spends time with them there swimming and different sporting activities for his children. He has four of them.

66

THE COURT: With predictable regularity such that we could make it part of the defined allowance.

MR. SCHOEPPL: Yes. Yes, your Honor. It can be scheduled.

THE COURT: Can I do this in a way that will work for you if I say allowances to travel to the community center with the children with permission from the officer?

MR. SCHOEPPL: Yes.

Your Honor, I have a passport that was filled up and he got a continuation passport after it was filled. I would like to give this to Pretrial.

THE COURT: That is not my -- I have limits --

MR. SCHOEPPL: Understood.

THE COURT: -- on what I can do.

MR. SCHOEPPL: Well, we have it to surrender.

THE COURT: OK.

MR. SCHOEPPL: Got it. So it's here.

THE COURT: All I can do is order you to do it. I can't actually take it.

MR. SCHOEPPL: We will do that.

MR. BROWN: I'm sorry, your Honor. Travel restricted, is it the entire State of California?

THE COURT: Southern District of California where he resides, Southern District of Florida where his case is indicted.

MR. BROWN: OK. Thank you.

THE COURT: OK. All right. And then with respect to the stay, Mr. Browne.

MR. BROWNE: We would ask until close of business tomorrow, your Honor. Obviously I need to file a notice of appeal. He's not going to meet a Nebbia condition in the next 24 hours and he's going to stay in regardless. Again, we're not trying to prolong this process.

THE COURT: I know you're not, Mr. Browne.

MR. BROWNE: So yes, your Honor, we would just ask formally for a stay for 24 hours.

To the extent Mr. Schoeppl wants to confer about the Nebbia requirement in anticipation of the appeal, I'm happy to do that. But again, I don't think he's going to be getting out in that time frame anyway.

THE COURT: Mr. Schoeppl, how do you feel about -- rather, do you have any argument you want to raise with respect to the stay being imposed until tomorrow?

MR. SCHOEPPL: No, your Honor. That's fair.

THE COURT: Great. All right, then. We will enter a written order denying the government's motion for detention so that Judge Moreno can see what occurred, and I think that's it.

MR. SCHOEPPL: I have one clarification. He'll need to meet with counsel in this case and I want to make sure that the travel restriction enables him to do that. In other words,

in addition to coming to court here, that he could also meet with us.

THE COURT: No, I specified an allowance for meeting with counsel.

MR. SCHOEPPL: Good.

THE COURT: Have you indicted -- I mean, rather, arraigned.

MR. SCHOEPPL: He's going to be arraigned on May 10th. We haven't entered a permanence yet.

THE COURT: All right. I see that you have that down. OK.

MR. SCHOEPPL: Great.

THE COURT: Anything further? Mr. Browne.

MR. BROWNE: Does the court have sufficient information on the properties?

THE COURT: Thank you. OK.

Can I have -- sorry. I see everybody else ready for the 1:30 and I'm getting ahead of myself.

Thank you, Mr. Browne.

Let me ask Mr. Antar to come forward.

Let me ask you to state your name for the record.

MR. ANTAR: George Hannah Antar.

THE COURT: Where do you reside, sir?

MR. ANTAR: San Diego, California.

THE COURT: I am being told that you are willing to

cosign on a $1.5 million personal surety bond for Mr. Akrum Alrahib. Is that correct, your Honor?

MR. ANTAR: Yes, your Honor.

THE COURT: What is your relationship to Mr. Alrahib?

MR. ANTAR: He's kind of like a brother to me, a cousin.

THE COURT: How long have you known him?

MR. ANTAR: Around 20 years.

THE COURT: I understand that you own a home in San Diego at 4131 Van Dyke Avenue, is that right?

MR. ANTAR: It's actually in an apartment building, rental property.

THE COURT: Do you own that outright?

MR. ANTAR: No, I don't.

THE COURT: Do you own -- to the extent that it's yours and it's mortgaged, are you the only owner or is it owned through a business?

MR. ANTAR: I am the owner, yes.

THE COURT: OK. All right. As a condition of a bond that I'm setting in this case I'm going to require that you not encumber that, meaning you can't take out any other new mortgage or transfer the property.

Do you understand?

MR. ANTAR: Yes, your Honor.

THE COURT: Are you so confident in Mr. Alrahib that

he will appear in court as required that you're willing to put that property up?

MR. ANTAR: Absolutely 100 percent.

THE COURT: Do you fully appreciate that if the bond is revoked that you are every bit as exposed to that $1.5 million debt, which is apparently almost the full value of your property's value?

MR. ANTAR: Yes, your Honor.

THE COURT: OK. All right. I appreciate that. Thank you for coming forward.

MR. ANTAR: Thank you.

MR. SCHOEPPL: Thank you, your Honor.

THE COURT: That is the first property. Let me ask Mr. Kerrins to come forward.

MR. SCHOEPPL: Your Honor, Mr. Kerrins owns two properties that are listed on page 19.

THE COURT: Good afternoon. Could I ask you to state your name for the record.

MR. KERRINS: Yes. Martin Patrick Kerrins.

THE COURT: Thank you for being here, Mr. Kerrins, and I very much appreciate your patience over the last four hours.

It's my understanding, Mr. Kerrins, that you are willing to cosign on a $1.5 million personal surety bond for Mr. Akrum Alrahib, is that correct?

MR. KERRINS: That's correct.

THE COURT: How do you know Mr. Alrahib?

MR. KERRINS: He is my nephew.

THE COURT: So you've known him his whole life?

MR. KERRINS: Pretty much all of it.

THE COURT: How would you describe your relationship with your nephew?

MR. KERRINS: It is, he's like my son besides my nephew.

THE COURT: Sir, there are two properties that I am told that you're willing to use as collateral, essentially, for these bonds and that you won't be able to encumber them during the duration of the bond, and should the bond be revoked, these properties could be at risk.

Is that your understanding of what it means to cosign these bonds?

MR. KERRINS: Yes, ma'am.

THE COURT: OK. I have one property that is listed at 4906 Riverside Drive in McCook, Illinois.

Do you own that house by yourself?

MR. KERRINS: It's an income-producing rental property, ma'am.

THE COURT: OK. But do you own it by yourself?

MR. KERRINS: Yes. Yes, ma'am.

THE COURT: What about at 4916 Riverside Drive, McCook, Illinois, do you own that property by yourself?

MR. KERRINS: Yes, ma'am.

THE COURT: No one else is on either of these titles?

MR. KERRINS: My wife is on the -- I don't think she is on the title. We got divorced since the properties were purchased and so her name was never taken off, but on the payment statement, but I'm the owner of the properties.

THE COURT: OK. You understand, sir, I mean, I see that these are valued collectively at about a million dollars. If the bond here was revoked and you're a cosigner on this $1.5 million bond, your exposure would exceed that of these two properties. That would potentially leave you exposed to the government not only to the value of your houses but maybe another half million dollars more.

Do you understand that?

MR. KERRINS: Yes, ma'am.

THE COURT: Are you so confident in your nephew that he's going to appear in court as required that you're willing to lose both these houses and maybe another half million dollars?

MR. KERRINS: Absolutely.

THE COURT: OK. I appreciate that and I appreciate you being here in court today.

MR. BROWNE: Your Honor, would the court inquire whether this gentleman is in business with Mr. Alrahib.

THE COURT: I mean, this isn't our Nebbia. He said

that there wasn't an issue with respect to the 1.5 million.

MR. BROWNE: I was just curious what the source of the funds were for the actual homes. I wasn't aware that he was a family member. Mr. Alrahib employs a number of family members in his business. But if the court doesn't think it's relevant, then I'll withdraw the request.

THE COURT: OK. I took to heart your statement about not needing to inquire about the source of the funds when we --

MR. BROWNE: I assume it was unrelated to the defendant's companies, your Honor, which very well may be the case.

I'll withdraw the request, your Honor.

THE COURT: I understand Mr. Browne.

All right. Mr. Kerrins, thank you very much for coming forward.

MR. KERRINS: Thank you, your Honor.

THE COURT: All right. So those are the three properties that we have that are not to be encumbered as a condition of the bond, which is, just to sum it up again, a $1.5 million personal surety bond to be cosigned by both Mr. George Antar and Mr. Martin Kerrins. None of the three properties that were just identified on the record are to be encumbered during the duration of the bond. The defendant will also have a $500,000 corporate surety bond, and the special conditions have already been enumerated. I am not going to do

that again.

So I will enter a stay that has a sunset provision of tomorrow night at close of business and a written order denying the government's motion for pretrial detention.

Is there anything else, Mr. Browne?

MR. BROWNE: As they say.

Does your Honor have a standard form in case there is an agreement with respect to Nebbia, assuming we don't prevail in the district court?

THE COURT: You know, I don't. I let the parties customize because it is usually very fact specific. So I appreciate something that is stipulated and it identifies -- whatever satisfies you is going to satisfy me, Mr. Browne.

MR. BROWNE: Understood.

THE COURT: OK.

MR. SCHOEPPL: Your Honor, thank you.

THE COURT: Thank you.

(Adjourned)

# C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription to the best of my ability of the digital audio recording in the above-entitled matter.

May 3, 2019

s/ Joanne Mancari
Joanne Mancari, RPR, CRR, CSR
Court Reporter
jemancari@gmail.com