UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-20165-CR-SMITH
Case No. 19-20664-CR-SMITH

UNITED STATES OF AMERICA

vs.

AKRUM ALRAHIB,

Defendant.
_____/

## FACTUAL BASIS

This Office and the defendant stipulate to and agree not to contest the following facts, and stipulate that such facts, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure, provide a sufficient factual basis for the defendant's pleas of guilty to count 1 of the indictment in case number 19-20165-CR-SMITH, which charges the defendant with conspiracy to (a) defraud the United States and (b) violate Title 26, United States Code, Section 5762(a)(3); all in violation of 18 U.S.C. § 371.

### Federal Tobacco Excise Tax and Customs Brokers

a. The Alcohol and Tobacco Tax and Trade Bureau ("TTB") administered and enforced Federal statutes and TTB regulations pertaining to, in part, tobacco products imported into the United States from a foreign country.

b. Tobacco products included "cigars," which were defined as "any roll of tobacco wrapped in leaf tobacco or in any substance containing tobacco." 26 U.S.C. § 5702(a) and (c). "Large cigars" were cigars weighing more than three pounds per one thousand cigars. 26 U.S.C. § 5701(a)(2).

1

    c.    A person or entity who imported tobacco products into the United States was required to pay excise tax ("Federal Tobacco Excise Tax") to the United States government. 26 U.S.C. § 5703(a)(1).

    d.    Federal Tobacco Excise Tax on imported large cigars was determined at the time the cigars were removed by the importer, or its designee, from the custody of United States Customs and Border Protection ("CBP") and entered domestic commerce. 26 U.S.C. § 5703(b)(1).

    e.    The importer, or its designee, was required to pay Federal Tobacco Excise Tax directly to CBP on or about the date on which the large cigars were released from CBP's custody. 27 C.F.R. § 41.41.

    f.    Tobacco importers often designated customs brokers to facilitate the importation of tobacco products into the United States. A customs broker was a person who was licensed to transact customs business, including, in part, the payment of duties, taxes, or other charges assessed or collected by CBP on merchandise by reason of its importation, on behalf of others. 19 C.F.R § 111.1.

    g.    Federal Tobacco Excise Tax properly due and owing on imported large cigars was calculated based on a statutorily mandated percentage of the price, exclusive of any tax, for which the cigars were to be sold by the importer (the "first sale price"). 26 U.S.C. § 5701(a)(2); 27 C.F.R. § 41.39.

    h.    The Federal Tobacco Excise Tax rate for large cigars was 52.75 percent of the first sale price, but not more than 40.26 cents per cigar. 26 U.S.C. § 5701(a)(2).

    i.    Importers typically charged their customers (i) the price of the tobacco products; (ii) any markup charged by the importer; and (iii) the importer's costs and fees, including the amount of Federal Tobacco Excise paid by the importer.

### Defendant's Companies

j. Trendsettah USA, Inc. ("TRENDSETTAH") was a California corporation authorized to transact business in Florida.

k. IST BRANDS, Inc. ("IST BRANDS") was a Florida corporation.

l. The defendant was a resident of the State of California. The defendant was the president and an owner of TRENDSETTAH, IST BRANDS, and several related entities, which conducted business in Florida, California, the Dominican Republic, and elsewhere.

m. TRENDSETTAH and IST BRANDS sold various tobacco products and marijuana paraphernalia, including large cigars and "blunt wraps," which were imported from the Dominican Republic.

### Havana 59' Cigar Company

n. Havana 59' Cigar Company ("HAVANA 59") was a Florida corporation incorporated by Gitano Pierre Bryant, Jr., a/k/a "Tony Bryant," on or about June 10, 2005.

o. Beginning in or around April 2013, Gitano Pierre Bryant, Jr., a TTB-permitted importer, began importing tobacco products, including large cigars, on behalf of the defendant and his companies.

### Federal Excise Tax Evasion Schemes

p. From in or around April 2013, through in or around July 2019, the defendant partnered with Gitano Pierre Bryant, Jr., and other TTB-permitted tobacco importers to import large cigars from the Dominican Republic into South Florida.

q. In order to lower their costs, the defendant agreed with Gitano Pierre Bryant, Jr., and other importers to underreport the Federal Tobacco Excise Tax due and owing on imported large cigars by concealing the actual first sale price, that is, the price the defendant actually paid

3

to the importers for the cigars.

r.   In order to hide the actual first sale price, the defendant, Gitano Pierre Bryant, Jr., and other importers conspired with the defendant to create false and misleading invoices. The false and misleading invoices made it appear that the defendant was purchasing large cigars from the importers at a price of between approximately $0.021 and $0.04 per cigar—the first sale price on which basis the Federal Tobacco Excise Tax would be calculated.

s.   Gitano Pierre Bryant, Jr., and other importers provided to CBP, often through a licensed customs broker, the falsified and misleading invoices knowing that the false first sale prices thereon would be used by the customs broker to calculate and report to CBP the Federal Tobacco Excise Tax due and owing on the imported cigars. In this manner, the importers consistently evaded the Federal Tobacco Excise Tax properly due and owing on large cigars that they imported into the United States on behalf of the defendant and his companies.

t.   In reality, the defendant paid far more for the imported large cigars. In order to conceal from CBP the actual price he paid for the cigars, and reduce the Federal Tobacco Excise Tax due and owing thereon, the defendant paid additional monies directly and indirectly to the Dominican Republic-based manufacturers. The defendant sent these additional monies through bank wires and money orders, which the defendant sent and caused to be sent, in interstate and foreign commerce, to the Dominican Republic-based manufacturers. During the course of the scheme, the defendant sent and caused to be sent at least $21,343,321.68 to the Dominican Republic-based manufacturers.

u.   In sum, by secretly sending payments directly to the Dominican Republic-based manufacturers, the defendant ensured that the actual first sale price he paid for the imported cigars was concealed from CBP.

4

v. This concealment of the actual first sale price paid by the defendant significantly reduced the amount of Federal Tobacco Excise Tax paid by the importers.

w. In exchange for the defendant's participation in the evasion scheme, at least one importer, Gitano Pierre Bryant, Jr., agreed to pay or "kick back" to the defendant a portion of the money Bryant saved by evading Federal Tobacco Excise Tax.

x. Gitano Pierre Bryant, Jr., paid such kickbacks to the defendant by (i) sending cigar-making machinery to the defendant and his companies, and (ii) paying the $9/hour wages of six hourly laborers whom Bryant had recruited for a short-term project to repackage cigars. The approximate dollar-value of these kickbacks was $701,669.

## Witness Tampering

y. On July 21, 2019, a Grand Jury sitting in the Southern District of Florida issued two subpoenas: one to IST BRANDS; and a second to IST BRANDS' officer and registered agent, an individual with the initials J.G. The subpoenas called for testimony as well as records and other information related to, among other individuals and entities, the Defendant and his tobacco distribution company, IST BRANDS.

z. An individual with the initials "C.K" would testify that or about August 2, 2019, the Defendant, while under house arrest, directed C.K. to approach J.G. and propose a way for J.G. to avoid testifying before the Grand Jury. According to J.G., during a meeting with C.K., C.K. stated that he was delivering a message on behalf of the Defendant. C.K. presented J.G. with two options. The first option presented by C.K. was an offer to arrange for J.G. to travel to Mexico for three to six years and earn approximately $200,000 per year operating the Defendant's businesses there. Under this option, J.G. could not come back to the United States and would have to avoid law enforcement. J.G. could have no contact with family members in the United States. Under

5



option two, J.G. was to "ride it out" with the Defendant and the lawyers.

aa. According to J.G., in the first scenario, C.K. told J.G. that it would be better to leave to Mexico before the date of the grand jury.

bb. Thereafter, during interviews with law enforcement, C.K. confirmed that he was approached by the Defendant, while the Defendant was on house arrest at C.K.'s residence, a few days prior to the August 2nd meeting with J.G. The Defendant and C.K. discussed the plan to offer J.G. an opportunity to avoid testifying before the Grand Jury.

cc. C.K. would testify that when explaining the proposal to C.K., the Defendant wrote out the terms of the proposal on a piece of paper, including the proposal to relocate J.G. to Mexico for several years in exchange for a $200,000 per-year salary. C.K. noted that, immediately following the Defendant's discussion with C.K., the Defendant tore the paper into pieces and discarded it. C.K. acknowledged that the purpose of the meeting with J.G. was to persuade J.G. to avoid testifying before the Grand Jury. C.K. acknowledged that it was wrong to attempt to persuade J.G. not to testify.

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

Date: 9/23/21   By: _____
CHRISTOPHER BROWNE
ASSISTANT U.S. ATTORNEY

Date: 9-23-21   By: _____ 9-23-21
HOWARD SREBNICK, ESQ.
ATTORNEY FOR DEFENDANT

Date: 9-23-21   By: _____ 9-23-21
JACKIE PERCZEK, ESQ.
ATTORNEY FOR DEFENDANT

Date: 9-23-21   By: _____
AKRUM ALRAHIB
DEFENDANT

6