**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 19-20165-CR-SMITH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

AKRUM ALRAHIB,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

**THIS CAUSE** is before the Court on the Government's Motion to Revoke and Estreat Bond (ECF No. 72) and Notice Re: Bond Forfeiture (ECF No. 291). This matter has been referred to the undersigned by the Honorable Rodney Smith, United States District Judge, to hear and determine (ECF Nos. 77; 100). Upon consideration of the Motion, Notice, Responses by the three non-parties: the corporate surety (ECF Nos. 91; 145) and the individual sureties (ECF Nos. 90; 93), Defendant's Response (ECF No. 123), the Government's Replies (ECF Nos. 98; 132), and following a hearing conducted on January 25, 2022, the undersigned respectfully recommends[1] that the Motion be **GRANTED**.

---

[1] Although at least one circuit has held that a forfeiture ordered by a magistrate judge is valid if adopted by the district court, *see United States v. Plechner,* 577 F.2d 596, 598 (9th Cir. 1978) citing *United States v. Ritte,* 558 F.2d 926 (9th Cir. 1977), the Eleventh Circuit has not addressed the issue of a magistrate judge's authority to declare a bond forfeited. *United States v. Balbuena,* No. 8:08-CR-271-T-27TGW, 2009 WL 87413, at *1 (M.D. Fla. Jan. 13, 2009); *see also United States v. Morris,* No. 2:17-CR-40, 2018 WL 1865889, at *1 (S.D. Ga. Feb. 13, 2018), *report and recommendation approved,* No. 2:17-CR-40, 2018 WL 1863651 (S.D. Ga. Apr. 18, 2018). Accordingly, a report and recommendation is being issued instead of an order.

## I.     BACKGROUND

Defendant was charged by indictment with conspiracy (18 U.S.C. § 371) (Count 1); conspiracy to commit wire fraud (18 U.S.C. § 1349) (Count 2); wire fraud (18 U.S.C. § 1343) (Counts 3-4); and fraudulent refusal to pay or evasion of Federal Tobacco Excise Tax (26 U.S.C. § 5762(a)(3)) (Counts 5-30). The alleged conspiracy spanned from April 2013 to December 2014. Defendant is alleged to have used his business to unlawfully evade payment of taxes associated with his importation and distribution of tobacco products.

At his initial appearance, the Government moved for pretrial detention on the ground that Defendant presented a serious risk of flight. 18 U.S.C. § 3142(f)(2). The undersigned conducted a hearing on April 30, 2019, and found that the Government did not demonstrate, by a preponderance of the evidence, that Defendant constituted a serious risk of flight and that no condition or combination of conditions would reasonably assure Defendant's appearance at trial (ECF No. 17). The undersigned set a $500,000 corporate surety bond, with a *Nebbia* condition, and a $1.5 million personal surety bond (*id.*).

The Government appealed the undersigned's decision (ECF No. 21). The Court affirmed the decision to set a bond but increased Defendant's corporate surety bond from $500,000 to $1 million, with a *Nebbia* condition, and entered the two bond orders (ECF No. 40). The corporate surety bond was then secured by co-signatories and sureties George Antar ("Mr. Antar") and Martin P. Kerrins ("Mr. Kerrins"), and by Lexington National Insurance Corporation ("Lexington National") (ECF No. 44 at 4-6). The personal surety bond was also secured by co-signatories and sureties Mr. Antar and Mr. Kerrins (ECF No. 45 at 4).

The Government subsequently moved to revoke and estreat Defendant's two bond orders after alleging that Defendant engaged in witness tampering and contempt, among other bond

violations (ECF No. 72). Defendant filed a Stipulation to Revocation of Pretrial Release, waived his right to a hearing, and agreed to the revocation of his pretrial release order (ECF Nos. 76; 76-1). The undersigned revoked Defendant's two bond orders (ECF No. 80), and Defendant has since admitted to the conduct of the underlying bond violations (ECF No. 280 at 5-6).

The Motion was set for an evidentiary hearing on March 10, 2020, but the hearing was canceled as a result of Defendant's illness on that morning and, at the parties' request to abate proceedings while the new criminal case was pending, was not reset until that case was resolved (ECF No. 290). After judgment was entered, the undersigned required the Government to advise whether it intended to persist in its demand for forfeiture of the bond (*id.*). Upon the Government's response that it did so intend (ECF No. 291), the Motion was reset for hearing.

The Government argues that Rule 46 of the Federal Rules of Criminal Procedure requires the court, on motion, to enter judgment as to any bond previously estreated and not subsequently set aside (ECF No. 72 at 5 citing FED. R. CRIM. P. 46(f)(3)) and that bail forfeiture is mandatory in this case (ECF No. 291 citing FED. R. CRIM. P. 46(f)(1)). The Government also argues that Defendant appears to have engaged in manipulation of the Court's *Nebbia* requirement (ECF No. 72 at 4). The Government filed a notice and provided bank statements for accounts controlled by Defendant and his companies that show payments were made by Defendant to the sureties, Mr. Antar and Mr. Kerrins (ECF No. 79). Specifically, the Government provided an account statement from Defendant's tobacco distribution company, Trendsettah USA Inc., showing a series of wire transfers, to include a transfer for $180,000 on March 29, 2019 to Mr. Kerrins and a $1.25 million payment for the benefit of the "John Antar Trust," an entity bearing the same surname as Mr. Antar (ECF No. 79-1). In addition, the Government provided account statements from other accounts controlled by Trendsettah USA Inc. and Defendant's Florida tobacco distribution company, IST

3

Brands, Inc., showing multiple wire transfers for the benefit of the "John Antar Trust" and Mr. Antar (ECF Nos. 79-2; 79-3).

Mr. Antar, one of Defendant's bond co-signers and sureties, argues that the interests of justice do not require that forfeiture of bond be entered against him as a surety. Mr. Antar contends that he personally has not engaged in any wrongdoing and served as a surety because Defendant is married to his cousin. He concedes that if a violation of a bond is established, the bond must be forfeited. However, Mr. Antar argues, pursuant to Rule 46, that the Court may set aside such forfeiture as to Mr. Antar if "it appears that justice does not require bail forfeiture" (*id*. (citing FED. R. CRIM. P. 46(f)(2)(b))). Mr. Antar insists that Defendant's action—bribing a potential witness and violating his house arrest—was without Mr. Antar's knowledge or participation. Mr. Antar also avers that the public's interest in Defendant's conduct was never compromised because Defendant did not miss any court appearances as a result of his alleged breach of his bond conditions. Mr. Antar argues that the Government experienced no cost or inconvenience in regaining custody of Defendant because Defendant was never a fugitive.

Furthermore, Mr. Antar insists that the multiple transactions that the Government alleges were manipulations of the *Nebbia*, thus, business related, and that he has provided the Government with all documentation regarding these transactions. For example, Mr. Antar contends that the $1.25 million wire was a return of funds to a trust account controlled by Mr. Antar and his son after Mr. Antar and his son had invested $1.22 million into Defendant's company the year prior and later demanded refund of that investment.

Mr. Kerrins, Defendant's uncle through marriage, contends that the interests of justice warrant the Court setting aside any bond forfeiture against him because he had no involvement with or knowledge of Defendant's alleged bond violations (ECF No. 93). Moreover, Mr. Kerrins

4

alleges that because the Government never lost custody of Defendant, this did not delay the proceeding, inconvenience the Government, or deprive the public of Defendant's appearance. Regarding the alleged manipulation of the *Nebbia* requirement, Mr. Kerrins argues that the Government has made unsupported accusations. Mr. Kerrins avers that the $180,000 payment did not relate to the *Nebbia* requirement because the money came from different accounts, and that the timing of the transaction indicates that the payment was unrelated to the bond.

Lexington National, the corporate surety on Defendant's bond, also argues that it was not responsible for Defendant's bond violations. Citing *U.S. v. Diaz*, 811 F.2d 1412, 1415 (11th Cir. 1987), Lexington National avers that a number of mitigating factors justify setting aside the forfeiture of the bond such as "the fact that the corporate surety played no part in the reason for the alleged violations; the government did not expend any cost to regain the custody of [Defendant]; there has been no delay in the proceedings due to his alleged breach; and, even if [Defendant's] alleged violations were willful, the corporate surety was not responsible for them" (ECF No. 91 at 10).

In Reply, the Government avers that because Defendant breached the conditions of his bond on multiple occasions, his bond should be forfeited. The Government maintains that it incurred considerable expense investigating Defendant's violations and crimes, which led to a separately indicted case.[2] Additionally, the Government argues that the sureties were aware of the risks involved by co-signing the bonds, especially considering the fact they were advised by the undersigned and reviewed the bond itself, which lists "Penalties and Sanctions Applicable to Sureties" (ECF No. 98 at 4). Specifically, the Government highlights the section in the bond document that states "Violation by the defendant of any of the foregoing conditions of release will

---

[2] *USA v. Alrahib*, 1:19-cr-20664-RS-1, (S.D. Fla. Dec. 1, 2021).

result in an immediate obligation by the surety or sureties to pay the full amount of the bond" (*id*.). The Government also alleges that the individual sureties, Mr. Antar and Mr. Kerrins, profited from Defendant's fraudulent conduct. Mr. Antar's family trust allegedly received a $1.25 million advance payment on a "fraudulently obtained judgment" (ECF No. 90 at 6). Although Mr. Antar describes the money as a return on investment paid by Trendsettah USA Inc., the Government avers that this money was not disclosed to the Court or the Government at the time Mr. Antar deposited his portion of the corporate surety bond premium. Relatedly, Mr. Kerrins, the Government alleges, received $180,000 of fraudulently obtained money. The Government argues that the $180,000 payment and an additional $70,000 payment to Mr. Kerrins' spouse were not disclosed to the Government when it requested proof that the portion of the corporate surety bond premium deposited by Mr. Kerrins satisfied the *Nebbia* condition imposed by the Court.

      **a. January 25, 2022 Hearing**

At the hearing, the Government and the sureties agreed that Rule 46 requires forfeiture of the bond, leaving only the question of whether it should be set aside. The sureties recognized their burden of demonstrating that justice does not require forfeiture of the bond.

George Antar was represented by counsel at the hearing and testified that he is acquainted with Defendant through church. Mr. Antar testified that he lives in California and did not have knowledge of Defendant's bond violation. Mr. Antar also introduced evidence of his prior relationship with Defendant through documents encompassing multiple business transactions (ECF Nos. 299-1 through 299-5). Between the years 2017 and 2019, Mr. Antar has received approximately $2.5 million from Defendant's family. Mr. Antar testified that he has already expended a significant amount of money defending this case. However, it was clarified that of the

approximately $40,000 in his out-of-pocket expenses thus far, he paid only $5,000 and his daughter paid $35,000.

Mr. Kerrins appeared via telephone and testified that he is Defendant's uncle, a former police officer, and Marine. Mr. Kerrins has had prior financial dealings with Defendant, unrelated to Defendant's businesses: he lent money to Defendant, and Defendant had honored the terms of that loan (ECF Nos. 300-1; 300-2). Mr. Kerrins testified that he did not participate in Defendant's violation.

The corporate surety, Lexington National, presented no evidence but requested that the entire amount be set aside and made an argument in favor of equity.

## II.     DISCUSSION

Federal Rule of Criminal Procedure 46(f) applies to bail forfeitures and contemplates a two-step process: (1) A court "must declare the bail forfeited if a condition of the bond is breached," but (2) a bail forfeiture may be "set aside in whole or in part ... if it [otherwise] appears that justice does not require bail forfeiture." FED. R. CRIM. P. 46(f)(1)–(2). All parties here recognize the two-step process and expressly agreed to both decisions resulting from this motion and hearing; all acknowledged that the matter has been fully briefed and no further opportunity to present evidence or argument has been requested.

Whether justice requires setting aside a bond forfeiture is a matter of the Court's discretion. *See United States v. Gonzalez*, 452 F. App'x 844, 845 (11th Cir. 2011) (finding district court has "virtually unbridled discretion" in dealing with matters of bond forfeiture under Rule 46); *see also Diaz*, 811 F.2d at 1415 ("district judge [has] virtually unbridled discretion in granting motions to remit bond forfeiture," and "[h]is decision may only be overturned upon a finding of arbitrary and capricious abuse of discretion"). For instance, in *United States v. Cureton*, the court set an

7

appearance bond in the amount of $25,000 to be secured by a surety and other conditions of the defendant's release. No. 2:15-CR-27, 2016 WL 11000018, at *1 (S.D. Ga. Mar. 10, 2016), *report and recommendation adopted,* No. 2:15-CR-27, 2018 WL 1320048 (S.D. Ga. Mar. 14, 2018). The defendant committed multiple violations of the court's pretrial release order such as leaving her assigned treatment center without permission, refusing to charge her location monitoring device, and being in possession of a nail file and clippers. *Id.* In the interests of justice, the magistrate judge recommended that the bail be forfeited and also recommended setting aside $25,000 of the $25,000 forfeiture. *Id.* at *3. Likewise, in *United States v. Morris*, the court set an appearance bond in the amount of $50,000 to be secured by a surety and ordered the defendant to not use or unlawfully possess a narcotic drug or other controlled substance. No. 2-17-cr-40, 2018 WL 1865889 *1 (S.D. Ga. March 27, 2018). The defendant later admitted to using marijuana and the court found that he violated the conditions of his release and revoked his bond. *Id.* at *2. The magistrate judge recommended that the bond be forfeited, yet also recommended that justice required setting aside the entire $50,000 bond forfeiture. *Id.* at *3.

The parties generally recognize that four factors are to be considered by the court to determine whether justice necessitates remission: (1) the cost and inconvenience to the government in regaining custody of the defendant; (2) the amount of delay caused by the defendant's default and the stage of the proceedings at the time of his disappearance; (3) the willfulness of the defendant's breach of conditions and the prejudice suffered by the government, and (4) the public interest and necessity of effectuating the appearance of the defendant. *Diaz*, 811 F.2d at 1415 (citing *United States v. Parr,* 594 F.2d 440 (5th Cir. 1979)). Each of the *Parr* factors relate to the actions of the government or of the defendant themselves. The *Parr* factors are not an exhaustive list as the Court may consider other facts. *See United States v. Nell,* 515 F.2d 1351, 1353 (D.C.

Cir. 1975). While the *Parr* factors do not expressly consider whether to set aside a bond where a surety is affected, the court may additionally consider the surety's participation in apprehending the bailee; and whether the surety is a professional or family member or a friend. *See United States v. Nguyen,* 279 F.3d 1112, 1115–16 (9th Cir. 2002), *citing United States v. Amwest Sur. Ins. Co.,* 54 F.3d 601, 602 (9th Cir.1995); *see also United States v. Gladding*, No. 1:09-CR-00265OWWSMS, 2010 WL 3075653, at *3 (E.D. Cal. Aug. 5, 2010), *report and recommendation adopted*, No. 1:09-CR-00265, 2010 WL 3618631 (E.D. Cal. Sept. 13, 2010).

Here, there is no dispute that Defendant violated the conditions of his bonds. Thus, the Government is entitled to the relief demanded, that is, forfeiture of the bond. As to the second step, whether to set aside the bond forfeiture in the interest of justice for the corporate and individual sureties, the undersigned examines Defendant's willfulness in breaching the release conditions, the sureties' participation in apprehending Defendant, the cost, inconvenience, and prejudice suffered by the Government, the mitigating factors or explanations offered by Defendant, the relationship between Defendant and the surety, and the appropriateness of the amount of the bond. *See Amwest*, 54 F.3d at 602. "These are merely non-exclusive factors for consideration, and '[n]ot all of the factors need to be resolved in the government's favor.'" *United States v. Sar–Avi,* 255 F.3d 1163,1167 (9th Cir. 2001), *quoting Amwest*, 54 F.3d at 603.

    a. **Willfulness**

Defendant's revocation resulted from several violations of the conditions of his bond, including failure to comply with the location monitoring as ordered and continuing to work in the tobacco industry while on bond. Most significantly, however, was the allegation that he attempted to bribe an employee of his company who had been subpoenaed by the grand jury to leave the country in order to frustrate that subpoena. On September 23, 2021, Defendant admitted to the

conduct of the underlying bond violations (ECF No. 280 at 5–6). Specifically, the Factual Proffer signed by Defendant as part of his plea of guilty in this case stated that while under house arrest, Defendant solicited the assistance of another person to persuade a grand jury witness to travel to Mexico in order to avoid appearing and testifying before the grand jury. Defendant's willfulness in breaching his release conditions weighs against set-aside and remission.

### b. Cost, Inconvenience, and Prejudice

"The government is not required to prove the actual cost of defendant's breach: the bond amount is a form of liquidated damages in the event of a breach." *Sar–Avi,* 255 F.3d at 1168. *See also Parr,* 594 F.2d at 442 (discussing the difficulty of calculating the government's search expense for the defendant, who had committed suicide at his ranch). Still, multiple courts have held that full or partial set-off was appropriate when the defendant was found or re-apprehended shortly after breaching the conditions of release. *United States v. Kirkman,* 426 F.2d 747 (4th Cir.1970); *United States v. Zuluaga-Berrio*, 377 F. Supp. 2d 611 (W. D. Tex. 2005).

In *Parr,* the Fifth Circuit found that the district court had abused its discretion in ordering forfeiture of the defendant's entire $75,000 cash bond because the defendant "willfully" failed to appear for sentencing after committing suicide at home. 594 F.2d at 444. The appellate court noted that the cost and inconvenience relating to the government's four-hour search for the defendant was minimal. *Id.* at 441–42.

In *Kirkman,* the defendant's attempt to mislead the court and delay trial by feigning an auto accident was foiled almost immediately, and guards posted at the hospital pending his release. 426 F.2d at 751. Since the government almost immediately recognized and addressed the defendant's breach of the conditions of release, the circuit court held that the district court had abused its

discretion in refusing to set aside the forfeiture of bond with regard to the third-party sureties. *Id.* at 752.

More recently, in *Zuluaga-Berrio*, a defendant remained at liberty while pending sentencing on a $25,000 surety bond, failed to appear, and was later found in Mexico City. 377 F. Supp. 2d at 612-13. The defendant was subsequently returned to the United States. *Id*. at 613. The court observed that the purpose of the bond was to ensure the defendant's appearance and his (ultimate) appearance for sentencing fulfilled the purpose of the bond. *Id*. at 614. The court ordered that the $25,000 bond be remitted less the government's investigative and transportation expenses in returning the defendant for his sentencing. *Id*.

The government describes considerable expenditure in resources as a result of Defendant's violations, pointing in support to the many docket entries in both this case and the related case, wherein Defendant was indicted for the witness tampering that prompted the motion to revoke the bond.

The sureties argue that because he never fled, and no resources were required to apprehend him, there was "no harm and no foul." The sureties' focus on the absence of expense incurred in securing Defendant's presence is misplaced. The conditions of bond had two purposes: reasonably assure his presence and to prohibit further violation of the law. The fact that the Government was not prejudiced by his failure to appear does not negate the significant investment of resources as a result of his violation of the second condition, as can be plainly seen from the docket.

### c. Amount of Bond

The propriety of the bond amount considers whether the amount of the bond was properly determined at its inception. *Amwest*, 54 F.3d at 604. "The hallmark of a liquidated damages provision is reasonableness at the time the agreement is made rather than a calculation of actual

provable losses when the breach occurs." *Id*. Moreover, a court must determine whether the amount of the defendant's bail was appropriate in light of the offense(s) charged. *United States v. Frias-Ramirez*, 670 F.2d 849, 853 (9th Cir. 1982).

Notably, the monetary portion of the bond amount originally imposed by the undersigned was adopted from the proposal made by Defendant himself. At the detention hearing, defense counsel advanced his proposal of a two-million-dollar bond package, comprising one bond in the amount of $500,000 secured by a bondsman; and another personal surety bond in the amount of $1,500,000 secured by Mr. Antar and Mr. Kerrins. In so recommending this bond package, Defendant recognized the appropriateness of that amount as liquidated damages considering the relative risk of noncompliance presented by this Defendant. On appeal of my Order denying the government's motion for pretrial detention, Judge Moreno modified the original conditions of Defendant's bond, raising the corporate surety bond from $1 million, with a *Nebbia* condition, leaving the personal surety bond as proposed by the defense at $1.5 million (ECF No. 40). While doubling the corporate surety bond amount represents a significant increase in the bond amount, it was rationally tied again to the serious risk of noncompliance supported by the Government's evidence. Accordingly, this factor weighs against set-aside and remission.

### d. Sureties' Participation

When a defendant has breached the conditions of release in a manner other than failing to appear for court proceedings, how a surety could have participated is often unclear. *Gladding*, 2010 WL 3075653, at *4. This factor is often of little weight in determining whether forfeiture of bond posted by a third-party is appropriate. *Id*.

In *Kirkman*, the Fourth Circuit discussed what the sureties could have done to obtain a defendant's presence at trial. 426 F.2d at 751. It did not appear that they knew of or even had the

12

opportunity to prevent the defendant from conspiring with others to fake an automobile accident and be hospitalized, nor could they have dragged the defendant to court once he had been hospitalized. *Id*. "It is difficult to see what [the sureties] could have done that would have been helpful to the court." *Id*.; *cf. Zulega-Berrio* 377 F. Supp. 2d at 614 (Where the "Bondsman spent time and money traveling to Houston twice and conducting surveillance in Mexico in an attempt to locate Defendant, who was eventually placed in federal custody. Because of Bondsman's expenditure of time and money to locate Defendant, it appears justice requires some remission.").

All three sureties here deny their involvement in Defendant's bond violation. As noted above, Lexington National advanced no evidence, though it is without meaningful dispute that the corporate surety had no involvement. Mr. Kerrins testified credibly that he had no involvement, and the undersigned accepts his testimony. Mr. Antar, however, admitted that he paid monies, at Defendant's request, to an employee of Defendant's company after his arrest; it is the same employee Defendant was accused of attempting to bribe in these witness-tampering allegations. The evidence does not show that Mr. Antar was *not* involved in Defendant's violations, though it is insufficient to conclude that he knew of Defendant's intent when he paid the witness as Defendant requested.

The co-signors are jointly and severally liable for the bonds (ECF Nos. 44 at 4; 45 at 4). While counsel for Mr. Kerrins argued that the judgment should be remitted for his client if not for all of the sureties, he advanced no caselaw or support. Adopting Mr. Kerrins' proposition would functionally rewrite the contract between the sureties, each of whom agreed to be liable for the full exposure. On balance, this factor weighs against set-aside and remission, notwithstanding the finding that Mr. Kerrins and the corporate surety had no involvement in the violations.

### e. Mitigating Factors

When determining whether there are any mitigating factors, district courts inquire into "whether [the sureties] should be relieved of their obligations." *Amwest*, 54 F.3d at 604. Another mitigating factor that courts consider is whether the sureties were aware of their obligations under the bond agreement. *See Frias–Ramirez,* 670 F.2d at 853.

In *United States v. Figuerola,* the Ninth Circuit remanded the case for an evidentiary hearing to determine whether the sureties understood their obligation on the bond after the district court declined to hear the sureties' testimony regarding their lack of understanding. 58 F.3d 502, 594 (9th Cir. 1995). The Ninth Circuit pointed out that the sureties "had no counsel, and were unfamiliar with American legal processes or bail procedures." *Id.* at 503. There were "obvious deficiencies" with the bond forms the sureties signed, with one surety signing a form "clearly intended for the defendant" and "[t]he other three sureties signed blank affidavit forms containing none of the required financial information" used to ensure "that each surety ha[s] sufficient assets to pay the amount of the bond." *Id.* at 503–04. The Ninth Circuit even remarked how the magistrate judge failed to speak with the sureties regarding their obligations on the bond. *Id.* at 504.

Here, the sureties were aware of their potential exposure if the bond was revoked. At the hearing on the Government's motion for pretrial detention, both of the individual sureties were present in the courtroom for the contested hearing and while I set the bond, including the many special conditions imposed with this bond. Before I accepted them as co-signers, I engaged each surety individually and explained the penalties should Defendant violate his bond. First, I questioned Mr. Antar if he fully appreciated that if the bond were revoked, he would be exposed up to the full amount of $1.5 million, which was then the value of the property he agreed not to

14

encumber during the pendency of the bond (ECF No. 28 at 70). I addressed Mr. Kerrins and asked again if he appreciated that his exposure, should the bond be revoked, could exceed the value of the two properties he had agreed not to encumber during the pendency of the bond (*id*. at 72).

Notwithstanding, Mr. Kerrins denies that he understood the bond could be revoked for violation of the special conditions and explains he thought the purpose of the bond was just to ensure that Defendant would show up. Mr. Kerrins testified that he did not "read the fine print" on the bond, though he admits that is no excuse for failing to appreciate the exposure he now faces. In fairness, Mr. Kerrins' understanding was partially informed by my limited questioning on his willingness to co-sign on the bond, which did not focus on the possibility of revocation for a violation other than non-appearance: "Are you so confident in your nephew that he's going to appear in court as required that you're willing to lose both these houses and maybe another half million dollars?"

Nonetheless, the bond signed by Mr. Kerrins in fact recites that "Violation by the defendant of any of the foregoing conditions of release will result in an immediate obligation by the surety or sureties to pay the full amount of the bond" (ECF Nos. 44 at 3; 45 at 3). I find the sureties were informed of the consequence of forfeiture and this factor weighs against set-aside and remission.

    **f. Sureties' Status**

A court must take into account whether the surety was a professional or a family member. *Frias–Ramirez,* 670 F.2d at 852. Here, Defendant's bonds were secured by a corporate surety, and two individual sureties.

The undersigned first considers the professional relationship of the corporate surety, Lexington National, to Defendant. Lexington National is in the business of risk assessment and received a substantial fee in return for its willingness to post bond on Defendant's behalf.

15

Moreover, Lexington National understood the consequences should Defendant violate his bond, and sought and obtained indemnification from both individual sureties. As the corporate surety, Lexington National retains the right to pursue claims against the individual sureties and Defendant himself. Under these facts, the undersigned recommends that justice does not require that the forfeiture be set aside for Lexington National.

Mr. Antar is an individual surety and claims to have a personal relationship with Defendant. Mr. Antar testified that he is Defendant's friend through church although he has completed multiple business transactions with Defendant. For instance, Mr. Antar was involved with Defendant's company and participated in the distribution of Defendant's tobacco products in California. Mr. Antar also purchased a vehicle for Defendant's wife in Mr. Antar's name. Additionally, between 2017 and 2019, Mr. Antar has received some $2.5 million from members of the Alrahib family. Because of Mr. Antar's significant and ongoing business relationship with Defendant, he has not met his burden to demonstrate that his bond amount be set aside. *See United States v. King*, 349 F.3d 964, 968 (7th Cir. 2003), *cert. denied* 541 U.S. 939 (2004) ("Sureties must shoulder the burden of demonstrating entitlement to exoneration or reduction").

Mr. Kerrins, on the other hand, testified that his niece is married to Defendant and he considers Defendant to be family. At the hearing, Mr. Kerrins discussed the pressure he faced from his family to sign the bond, his financial means to do so, and even a previous loan he provided to Defendant that in essence proved Defendant's trustworthiness to Mr. Kerrins. Mr. Kerrins has not previously been involved in any of Defendant's businesses.

Mr. Kerrins argued that he is currently in poor health and has paid over $120,000 for expenses incurred in this matter already. Mr. Kerrins makes a policy argument similar to the "loving relative" exception discussed in *Nguyen*, which the majority in that case declined to adopt.

*See United States v. Famiglietti*, 548 F. Supp. 2d 398, 407 (S.D. Tex. 2008) ("In *United States v. Nguyen*, for example, the Court of Appeals for the Ninth Circuit expressly refused to adopt a "loving relative" exception to [the Circuit's] bond forfeiture jurisprudence.' In upholding a trial court's refusal to set aside even part of a forfeiture, the majority in *Nguyen* clearly rejected the argument (advanced in the dissenting opinion) that judges should take into account (as a mitigating factor) the effect the forfeiture would have on the sureties-even if that effect would be devastating and the amount of money forfeited to the government clearly was much greater than the costs the government incurred because of the defendant's breach."). *See also United States v. Russe*, 2012 WL 3308623, at *3 (N.D. Ill. Aug. 13, 2012) ("[I]t is presumed in the very nature of a bond agreement that the sureties will suffer if the defendant fails to honor his commitment. The sureties have not presented, nor has the Court found, any decision that waived forfeiture on the basis of related personal suffering.").

Mr. Kerrins' potential financial hardship, though unfortunate, is not a factor considered in determining whether to set-aside the bond. *See United States v. Villalobos*, 2005 WL 6127290, at *6 (N.D. Cal. Feb. 17, 2005) ("Thus, if severity of financial hardship were a ground for setting aside a forfeiture, or for significantly reducing the amount owing, courts could not assume that sureties with limited means would believe their bond commitments were real."). Whether "justice" does not require forfeiture, accordingly, does not depend on the nature and relative severity of the harm that would be visited upon the surety. *Id.* at 3-4 (citing *Diaz*, 811 F.2d at 1416).

While "[t]he purpose of a bail bond is not punitive," *Parr,* 594 F.2d at 444, setting aside the sureties' obligation on this bond would have future effects on bond commitments in this district because future sureties would not take their obligations seriously. While I recognize that the amount of the bond is high—over two million dollars—courts in our District have forfeited

significant monetary bonds even where the defendant was returned to complete the proceedings, and even where sureties were jointly liable for the forfeited bond. *See USA v. Tanelus*, 1:01-cr-00264-AJ-1 (S.D. Fla. Nov. 5, 2009) (ECF No. 25); *USA v. Torres, et. al*, 1:10-cr-20191-UU (S.D. Fla. July 27, 2010) (ECF No. 60); *USA v. Paul*, 0:07-cr-60259-KMW (S.D. Fla. July 8, 2008) (ECF No. 40). Ultimately, the undersigned recommends that justice does not require setting aside the complete forfeiture of the sureties' bond.

### III. CONCLUSION

Based on the foregoing, I therefore **RECOMMEND** that the Government's Motion be **GRANTED**. I further recommend no portion of the bond be remitted or set aside.

Pursuant to Local Magistrate Rule 4(b), counsel has fourteen (14) days from the date of this Report and recommendation to serve and file written objections, if any, with the Honorable Rodney Smith, of the United States District Court for the Southern District of Florida. Failure to file objections by that date shall bar the parties from de novo determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida this on this 27th day of June, 2022.

_____
LAUREN FLEISCHER LOUIS
UNITED STATES MAGISTRATE JUDGE